## Case No. 12,264.

SALMON FALLS MANUF'G CO. v. GODDARD.

[See Case No. 12,263.]

## Case No. 12,265.

SALMON FALLS MANUF'G CO. v. The TANGIER.

[21 Law Rep. 6; 6 Am. Law Reg. 504; 42 Hunt, Mer. Mag. 453.]

Circuit Court, D. Massachusetts. May Term, 1857.

SHIPPING—CARRIERS OF GOODS—DELIVERY—FAST DAY—NOTICE—FIRE—DAMAGE OF SEAS.

1. To constitute a delivery by the master, of goods brought in a vessel from a port in another state to the port of Boston, under the ordinary bill of lading, mere unlivery of the goods and landing them on the wharf is not sufficient; there must also be reasonable notice to the consignee, allowing him time to make the usual and necessary preparations to receive the goods. And it is no delivery to unlade the goods at an unusual time. Thus, where, by the usage of a port, consignees are not in the habit of receiving goods on the day of the annual fast, a notice by the master to the consignee that he shall unload the goods on that day, will not bind the consignee to receive them; and where goods were so unladen, and not accepted or received by the consignee, and were, on the same day, destroyed by fire on the wharf: *Held*, that the loss must fall upon the carrier.

[Cited in The E. H. Fittler, Case No. 4,311; The Edwin, Id. 4,300; The Boston, Id. 1,-671; One Thousand Two Hundred and Sixty-five Vitrified Pipes, Id. 10,536; The Williams, Id. 17,710. Cited in dissenting opinion in Constable v. National Steamship Co., 154 U. S. 92, 14 Sup. Ct. 1078.]

2. Fire, occurring on the wharf, after goods are landed, is not within the exception of dangers of the seas, in the ordinary bill of lading.

3. Nor is such a fire within the act of congress of March 3d, 1851 [9 Stat. 635], relieving ship owners from liability for damage by fire to goods on board of vessels, in certain cases.

[Cited in The Edwin, Case No. 4,300. Cited in dissenting opinion in Constable v. National Steamship Co., 154 U. S. 80, 14 Sup. Ct. 1073.]

[Appeal from the district court of the United States for the district of Massachusetts.] In admiralty.

CURTIS, Circuit Justice. This is an appeal from a decree of the district court, in a suit in rem founded on a bill of lading in the usual form, signed by the master of the Tangier, at Apalachicola, on the 3d day of March, 1856, for one hundred bales of cotton, to be delivered at the port of Boston, (the dangers of the seas only excepted,) unto John Aiken, the treasurer of the Salmon Falls Company, to which corporation the cotton belonged. The district court decreed in favor of the claimants [Case No. 12,267], and the libellants appealed.

The material facts, which are not in dispute, are, that the bark arrived in the port of Boston on Sunday, the 6th day of April, 1856. On Monday, at the request of Goddard & Pritchard, who were the consignees of the larger part of the cargo, the bark was hauled to Lewis Wharf, and the unlading was begun. At some time between the hours of ten, a. m., and three, p. m., notice was given to Aiken's clerk, at his counting room, that the Tangier had hauled to the north side of Lewis Wharf, and had commenced discharging. The work of discharging was begun between two and three o'clock, p. m., and continued about two hours. On Tuesday, it was further continued until one o'clock, p. m., when it ceased, because there was not room on the wharf to receive more cargo. It was not resumed on Wednesday for the same reason. On Thursday, which was the day fixed by the proclamation of the governor of Massachusetts for the annual fast-day, the work was resumed at seven o'clock, a. m., and prosecuted till one o'clock; at which time the cotton belonging to the different consignees was all out of the vessel, and such of it as had not previously been removed by the consignees, had been separated into lots, according to the various marks, and was ready for delivery. Immediately afterwards, an accidental fire broke out on the wharf, and the cotton was burned. Pursuant to the notice received by the libellants on Monday afternoon, they sent men and teams to the wharf on Tuesday morning, and by one o'clock had removed thirty-five bales, which was all that could be found on the wharf belonging to the libellants. On Wednesday morning, the same men and teams were again sent to the wharf, but only one bale of the libellant's cotton could then

be found, and the person in charge of the teams was informed by the mate of the bark that no cotton had been discharged since one o'clock, the previous day, for want of room on the wharf, and he did not know when they should recommence discharging. So that, down to Thursday, there was no want of diligence on the part of the libellants, in acting on the notice given them, and being in readiness to receive all that was in readiness to be delivered. Sixty-five of their bales of cotton were burned, and the question is, whether it was at their risk, or that of the bark, at the time of the fire.

The bill of lading in this case imports an obligation to carry and to deliver the goods, qualified only by the exception of danger of the seas. Fire, occurring on the wharf, after the goods are landed, is not within the exception. Garrison v. Memphis Ins. Co., 19 How. [60 U. S.] 312; Airey v. Merrill [Case No. 115]. So that, for the purposes of this case, there was one entire and absolute contract to carry and deliver; and the question is whether it had been performed when the goods were destroyed. Actual delivery can be made by a carrier only to the consignee, or some one representing him, and who assents to and does receive the goods. But, inasmuch as the liability of the carrier, as such, cannot be protracted by the neglect or refusal of the consignee to receive the goods, an offer to deliver them at such a time and place, and in such a manner, as is required by the contract, accompanied by a present ability so to deliver them, is so far equivalent to an actual delivery, that it terminates the liability of the carrier, as carrier, though a duty of custody and care may, under some circumstances, then arise. The questions, at what time and place, and in what manner, the delivery may be offered, and how the offer may be made, depend on the usage of the business in which the particular transaction occurs. Stated generally, it may be said to be the usage of the business in which this transaction occurred, for the vessel to be placed at some suitable wharf, and notice given to the consignees of the cargo, of the place where the vessel lies, and that the cargo is about to be discharged. It is then landed and made ready for delivery. The consignees, after receiving such notice, are expected to take notice of the fact that their consignments are made ready for delivery; and as soon as they are so, they are, in judgment of law, delivered, and the carrier's peculiar liability is ended. Such is the usage in point of fact, and like many other settled usages of commerce, it is recognized by the law, and has become a rule which courts of justice take notice of and enforce. But this rule has several important qualifications. In the first place, it is necessary that the notice to the consignee should be a reasonable notice. By which I understand that it must not so long precede the readiness to deliver, as to impose on the consignee an unusual and unnecessary bur-

den of keeping in readiness to receive and transport his goods; nor, on the other hand. that it should fail to allow the consignee reasonably sufficient time to make usual and necessary preparations to receive and transport them. In the next place, the goods must not only be placed on the wharf—they must be made ready for delivery. The mere discharge of a cargo is not equivalent to a delivery of the cargo. On the contrary, important rights and interests, both of the shipowner and the consignees of the cargo, depend upon the preservation of the distinction between unlading and delivery. This is well illustrated by the case of Certain Logs of Mahogany [Case No. 2,559]. In that case, the cargo was libeled for freight due under a charter-party, which made the freight payable "in five days after the brig's return to and discharge in Boston." It was insisted that this displaced the lien; because it showed that a credit was to be given after the cargo should be delivered. Mr. Justice Story held otherwise. He considered that not only were discharge and delivery distinct from each other. but that the consignee had a right to have his goods landed, and so placed that he could ascertain their condition before he made himself liable for the freight; and that the master had the right to unliver the cargo, and still retain it in his own possession, until the freight should be paid. Such is the maritime law of England and France, as well as of this country. See also Ostrander v. Brown, 15 Johns. 39, where it is expressly laid down that landing on a wharf is not delivery. If we consider the grounds upon which the law terminates the liability of the carrier without an actual delivery, it will be apparent that mere univery is not sufficient. Those grounds are, readiness to deliver, accompanied by such an offer to deliver as the consignee is bound to act upon. If the carrier is not ready to deliver, it is of no importance from what cause such want of readiness proceeds. Whether it be because the goods are still in the vessel, or because they are so mixed with others on the wharf that they are not accessible. or because the master intends to insist on his lien for freight, or for an average bond, is immaterial. If he is not ready to deliver, the law does not deem the delivery made, and he must be ready to deliver at such a time as the consignee is bound to receive his goods. The law does not allow the carrier's liability to be protracted by the neglect or refusal of the consignee to receive his goods. But until there is some neglect the principle does not apply. All will agree that if the master be ready to deliver on Sunday, or in the night time, such readiness cannot avail; for there is no duty incumbent on the consignee to receive goods at such times, and consequently no neglect on his part. These principles, when applied to the facts shown in evidence, are sufficient to determine this case.

The sixty-five bales of cotton belonging to the libellants, which were destroyed, were made ready for delivery on Thursday, the tenth of April. That was the day of the annual fast. The evidence is decisive that it was not usual for consignees to receive goods on that day. A large number of merchants, custom-house officers, wharfingers, and port-wardens have been examined; their testimony covers a period of more than twenty years. and embraces an ample amount of knowledge of the business in which this transaction occurred. And it clearly shows that the annual fast, during the entire period, has been a day when merchants do not receive consignments of goods. It is also proved that in frequent instances, when the discharge of a vessel has been left incomplete, it has been completed on the fast-day; though this practice seems to be limited to goods not perishable; and the reason assigned for not landing perishable goods on that day is that consignees do not take away their goods on that day. There is no inconsistency in these courses of business, nor any conflict of rights growing out of them. The time when the cargo is discharged is at the will of the master. He may unlade it and make it ready for delivery on the Fourth of July, or in the night-time, if he chooses so to do. And he may unlade it without notice to the consignee. But such an unlading and preparation to deliver, are not equivalent to a delivery, because there is not such reasonable opportunity for the consignee to receive his goods, and such neglect of that opportunity, as the law puts in place of an actual delivery. The practice to complete the discharge of vessels on the fast-day, may satisfactorily show that it is a reasonable and proper act. . It may justify the master as between him and the owners of the vessel. And so, many emergencies might justify him in discharging in the night-time, or even on Sunday. In the absence of all other evidence, proof of a usage to complete discharge on the fast-day, might also be sufficient to show that it was a usual and reasonable time to make delivery; because the reception of goods usually takes place on the day when they are discharged. But the proof is direct and clear that the fast-day is not a usual time for the delivery of the goods. Taking the entire evidence into view, it comes to this: The master, may, if he please, discharge on the fast-day; but he does so with the knowledge that there will be no delivery of them till the next day; because a discharge and readiness to deliver are not a delivery, and do not become so, until some usual time arrives for the consignee to attend for the purpose of receiving his goods.

It was strongly urged that the observance of the fast-day is purely voluntary; that there is no legal obligation to observe it; and that to deprive the master of the power to offer a delivery on that day, would compel him to observe the day, and thus trench on his legal right to work on that day, if he

choose to do so. But the same argument would apply to the Fourth of July, which I believe is universally kept as a holiday. And the answer to it in that case, as well as in the case at bar would be, that all who engage in a particular business must conform to the reasonable and lawful usages of that business; that what is usual in respect to times and places and modes of doing business, in the absence of any rule of law to the contrary, becomes a rule which all concerned are understood to assent to when they engage in that business; and that, for a master to insist that a consignee should not observe a particular day, usually observed by consignees, would deprive the consignee of a right of choice, secured to him by the usage, and by the implied consent of the master himself.

After the fullest consideration, I am of opinion that these goods were destroyed before the time had arrived for the consignee to receive them; that consequently there was no delivery in point of law, and the vessel is liable for their value, unless relieved by the first section of the act of congress, of March 3d, 1851 (9 Stat. 635). This section is copied from the second section of the act of 26 Geo. III. c. 86, which received a judicial interpretation by the court of queen's bench in Morewood v. Pollok, 18 Eng. Law & Eq. 341. It was there held that the act did not extend to the case of a fire occurring on board a lighter, in which cotton was being conveyed from the vessel to the shore. This decision is in conformity with the language of the act, which limits its operation to fire happening to or on board of the vessel. Without a departure from the plain meaning of the words of the act, I cannot extend it to a fire happening on shore. The result is, that the decree of the district court must be reversed, and a decree entered in favor of the libellants for the value of the cotton and costs.

[NOTE. The decree in this case was, in effect, reversed by the supreme court in Richardson v. Goddard, 23 How. (64 U. S.) 28. After the rendering of this last decision the circuit court granted a new hearing in this case, at which it reversed the decree, as rendered above, and entered a decree affirming the decree of the district court, the last opinion being delivered by Circuit Justice Clifford. Case No. 12,266.]