# CONSTABLE *v.* NATIONAL STEAMSHIP COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 21.   Argued April 6, 9, 1894. — Decided May 26, 1894.

In the bill of lading of a quantity of cases and bales of goods delivered to the National Steamship Company at Liverpool, and addressed and consigned to C. in New York, it was provided as follows : " Shipped in good order and well conditioned . . . in and upon the steamship called the Egypt . . . bound for New York . . . forty-three cases merchandise . . . being marked and numbered as in the margin, and to be delivered subject to the following exceptions and conditions : . . . The National Steamship Company or its agents or any of its servants are not to be liable for any damage to any goods which is capable of being covered by insurance . . . nor for any claims for loss . . . where the loss occurs while the goods are not actually in the possession of the company. . . . The goods to be taken alongside by the consignee immediately the vessel is ready to discharge, or otherwise they will be landed by the master and deposited at the expense of the consignee, and at his risk of fire, loss, or injury in the warehouse provided for that purpose, or in the public store, as the collector of the port of New York shall direct. . . . The United States Treasury having given permission for goods to remain forty-eight hours on wharf

at New York, any goods so left by consignee will be at his or their risk of fire, loss, or injury." The Egypt arrived January 31, 1883, was entered at the custom-house at 1.45 P.M. of that day, and, there being no room for her at the pier of the National Company, where the vessels of that company were usually unladen, was taken to the pier of the Inman Company. A collector's permit was given to unload the steamer and to allow the unpermitted cargo to remain on the wharf for forty-eight hours, upon an agreement by the steamship company, which was given, that the goods should be at the sole risk of that company, who would pay to the consignee or owner the value of such cargo respectively as might be stolen, burned, or otherwise lost. Notice of the time and place of the discharge was then posted upon the bulletin board of the custom-house, in accordance with custom, but no notice was sent to C., nor did he have any notice. The cases and bales consigned to him were on the same day landed on the Inman pier, but he had no knowledge of it, and had no opportunity to remove the goods on that day; and, if he had had such knowledge, there was not sufficient time for him to have entered, paid the duties, obtained the permits for their removal, and removed them. On the night of that day the goods were destroyed by fire, without any imputed negligence to the National Steamship Company. *Held*,

(1) That the stipulation in the bill of lading that respondent should not be liable for a fire happening after unloading the cargo was reasonable and valid;

(2) That the discharge of the cargo at the Inman pier was not in the eye of the law a deviation such as to render the carrier an insurer of the goods so unladen;

(3) That if any notice of such unloading was required at all, the bulletin posted in the custom-house was sufficient under the practice and usages of the port of New York;

(4) That libellants, having taken no steps upon the faith of the cargo being unladen at respondent's pier, were not prejudiced by the change;

(5) That the agreement of the respondent with the collector of customs to pay the consignee the value of the goods was not one of which the libellants could avail themselves as adding to the obligations of their contract with respondent.

THIS was a libel in admiralty by the firm of Arnold, Constable & Co. against the National Steamship Company, owner of the British steamship Egypt, to recover the value of thirty-six cases of merchandise carried by this steamer from Liverpool to New York, delivered on the pier of the Inman Steamship Company on January 31, 1883, and upon the same night destroyed by fire through the alleged negligence of the respondent. The answer admitted most of the material

Statement of the Case.

allegations of the libel, but denied all charges of negligence, and also of liability for the loss of the merchandise.

Upon a hearing upon pleadings and proofs in the District Court, the libel was dismissed, (29 Fed. Rep. 184,) and upon appeal to the Circuit Court, the decree was affirmed.

Libellants thereupon appealed to this court.

The following is an abstract of the facts found by the Circuit Court, so far as the same are material to the questions involved :

"2. The Egypt was one of a line of steamers owned by the respondent, and plying regularly between Liverpool and New York as common carriers. The steamers of this line arrived as often as from three to eight times per month.

"3. Respondent has run a line of such steamers for over twenty years, and during that time has docked them at a dozen different piers in the city of New York. From 1872 to 1878 it leased the pier No. 36, (old No. 44,) North River, and usually docked its vessels there. Subsequently it leased pier No. 39, North River, about six hundred feet north of pier No. 36, and has since usually docked its vessels there, and not elsewhere. The piers between Nos. 35 and 41, North River, (excluding pier No. 37,) were in 1883 all used by regular English steamship lines. These lines usually dock at their own piers, but not always, and in case of any emergency dock elsewhere, and permit each other, when the necessity arises, to use the exclusive dock of each.

"4. That said goods were shipped at the port of Liverpool on board the Egypt, and were consigned to the libellants at New York under a bill of lading, the material portions of which are cited in the opinion. (A copy is also given in the margin.[1]) The Egypt also carried as a considerable portion

---

[1] *Copy of bill of lading.*

National Steamship Company, Limited.

Head Office, 21 Water Street, Liverpool; New York Office, 69 Broadway.
Liverpool to New York every Wednesday.

[Stamp, six pence.]

Shipped in good order and well conditioned, by Moore & Pringle, in and upon the steamship called the Egypt, whereof —— —— is master for the

of her cargo goods shipped by the Inman Company, which had given respondent the option of discharging at its pier, No. 36.

---

present voyage, or whoever else may go as master in the said ship, and now lying in the port of Liverpool and bound for New York via Queenstown, with liberty to sail with or without pilots, and to tow and assist vessels in all situations and to all ports —

Forty-three cases merchandise, (linens and cottons,) three cases and five bales (carpets and Dundees) being marked and numbered as in the margin, and to be delivered subject to the following exceptions and conditions, viz. : The act of God, the Queen's enemies, pirates, robbers, thieves by land or at sea, barratry of master or mariners, restraint of princes, rulers, or peoples, loss or damage resulting from vermin, rust, sweating, wastage, leakage, breakage, or from rain, spray, coal, or coal dust, insufficiency of strength of packages, inaccuracy, indistinctness, illegibility, or obliteration of marks, numbers, brands or addresses, or descriptions of goods, injury to wrappers, however caused, or from corruption, frost, decay, stowage, or contact with or smell or evaporation from other goods, or from loss or damage caused by heavy weather or pitching or rolling of the vessel, or from inherent deterioration, risk of lighterage to or from the vessel, transshipment, jettison, explosion, spontaneous combustion, fire before loading in the ship or after unloading, heat, boilers, steam, or steam machinery, including consequences of defects therein or damages thereto, collision, stranding, straining, or other perils of the seas, rivers, steam and steam navigation or land transit of whatsoever nature or kind, and all damage, loss, or injury, arising from the perils or matters above mentioned, and whether such perils or matters arise from negligence, default, or error in judgment of the pilot, master, mariners, engineers, stevedores, or other persons in the service of the ship owner.   Not accountable for weight, contents, value, length, measure, or quantities or condition of contents, nor for money, documents, gold, silver, bullion, specie, precious metals, jewelry, precious stones, or other highly-valued goods, or beyond the amount of one-hundred pounds sterling for any one package, unless bills of lading are signed therefor and the value therein expressed and freight paid accordingly.   The National Steamship Company, Limited, or its agents or any of its servants are not to be liable for any damage to any goods which is capable of being covered by insurance, nor for any claim, notice of which is not given before the remova of the goods, nor for any claims for loss, damage, or detention to goods under through bill of lading where the loss or detention occurs or damage is done whilst the goods are not actually in the possession of the National Steamship Company (Limited) or shipped on board the National Steamship Company's (Limited) steamer, nor in any case for more than known or invoiced value of the goods, whichever shall be least. Goods of an inflammable, explosive, or otherwise dangerous character, shipped without permission and full disclosure of their nature and con-

Statement of the Case.

"5. The Egypt arrived on January 31, 1883, and was entered at the custom-house at 1.45 o'clock in the afternoon."

---

tents, may be seized and confiscated or destroyed by the ship owner at any time before delivery without any compensation to the shipper or consignee. In case any part of the within goods cannot be found for delivery during the vessel's stay at the port of destination they are, when found, to be sent back by first steamen at ship's expense, the steamer not to be held liable for any claim for delay or sea risk.

The only condition upon which glass will be carried is that the ship owner shall not be held liable for any breakage which may occur from negligence or any other cause whatever.

The goods to be taken from alongside by the consignee immediately the vessel is ready to discharge, or otherwise they will be landed by the master and deposited at the expense of the consignee and at his risk of fire, loss, or injury in the warehouse provided for that purpose, or in the public store, as the collector of the port of New York shall direct, and when deposited in the warehouse or store to be subject to storage, the collector of the port being hereby authorized to grant a general order for discharge immediately after entry of the ship.

The United States Treasury having given permission for goods to remain forty-eight hours on wharf at New York, any goods so left by consignee will be at his or their risk of fire, loss, or injury.

In the event of the said steamer being prevented from any cause from commencing or pursuing this voyage or putting back to Liverpool or into any port, or otherwise being prevented from any cause from proceeding in the ordinary course of her voyage, to have liberty to transship the goods by any other steamer to call at any port or ports.

All fines, expenses, losses, or damage which the ship or cargo may incur or suffer on account of incorrect or insufficient marking of the packages or description of their contents shall be paid by the shippers or consignee, as may be required, and the ship owner shall have a lien upon the goods for the payment hereof.

In the case of all goods at through rates to the interior of the United States or Canada the shipper or consignee engages to supply the agent of the steamer at New York (F. W. J. Hurst) with the necessary papers for passing the goods through the custom-house by the time of steamer's arrival or to pay all extra expense incurred in default thereof.

Should any existing or future order or restriction of the English emigration commissioners or of the English board of trade authorities prevent the above goods from being conveyed in any passenger vessel, the National Steamship Company (Limited) or any of its servants or agents are to be free of any liability for non-fulfilment of their portion of this contract. In accepting this bill of lading the shipper or other agent of the owner of the property carried expressly accepts and agrees to all its stipulations, exceptions, and conditions (whether written or printed) in the like good

"7. For a month or more respondent had been blocked at its own pier, No. 39, in consequence of heavy cargoes, delays of its vessels by westerly winds and ice in the slips, and had been obliged in consequence to discharge two of its vessels at outside uncovered piers.

"8. Respondent's manager had arranged to send the Holland, another ship of respondent's line, and due before the Egypt, to its own pier, No. 39, and to send the Egypt to the Inman pier, No. 36. This arrangement was carried out — the Holland sent to No. 39, and the Egypt to No. 36, there being no room for her at No. 39.

"9. Steamers of regular lines, on their arrival at New York, if their docks are blocked, are not kept in the stream longer than to enable them to get berthed elsewhere. If kept in the stream the consignees make great complaint. It was more costly to dock the Egypt at No. 36, but this was done to secure to the consignees a more prompt discharge and delivery of their goods.

"10. That the Egypt began at about 4.30 o'clock in the evening of said 31st of January, 1883, to discharge her cargo upon the dock, and the thirty-six cases of merchandise belonging to the libellants were landed and discharged there prior to the fire.

---

order and well conditioned, from the ship's tackle, (where the ship's responsibility shall cease,) at the aforesaid port of New York, unto Messrs. Arnold, Constable & Co. or to his or their assigns. Freight and primage for the said goods to be paid at New York as per margin. General average, if any, payable according to York and Antwerp rules. Freight, if payable in Liverpool, to be paid on delivery of the bills of lading in cash, without deduction, vessels lost or not lost. Freight, if payable abroad, to be paid in currency or gold (at the current rate of exchange for banker's sight bills on the day of the steamer's arrival) at consignee's option and before delivery of any portion of the goods specified.

In witness whereof the master or agent of the said ship hath affirmed to two bills of lading, exclusive of the master's copy, all of this tenor and date, one of which bills being accomplished, the other to stand void.

A. TITHERINGTON.

Dated in Liverpool, 18 January, 1883.

(In the margin of the bill of lading appear the numbers of the various packages of merchandise.)

"11. Upon the entry at the custom-house of the Egypt. there was granted by the collector of customs a general order to unload the steamer, and to send packages to the public store. An application was also immediately made to the collector to allow the unpermitted cargo to remain upon the wharf for forty-eight hours from the time of the granting of the general order. This application was in the following form :

"To W. H. ROBERTSON, Esq., *Collector of Customs.*

"Request is hereby made to allow the cargo of the steamer Egypt, Sumner, from Liverpool, England, unladen but not permitted, to remain upon the wharf for forty-eight hours from the time of granting general order, at the sole risk of the owners of said steamer, who will pay to the consignee or owner the value of the such cargo respectively as may be stolen, burned or otherwise lost, and who will also pay all duties which may be in any way lost by so remaining.

"F. J. W. HURST, *Owner,*
"Per J. C. RYOR, *Attorney.*"

"Such application was in the form required by the collector, without which permit would not be granted, and the entire cargo would be sent to public store. A permit was granted by the collector upon this application. A special license was also granted to unload the steamship after sunset, and a bond in $20,000 was given for such license, as required by law.

"12. The general order above stated, the special license, the applications and permits, and the agreements and engagements therein contained were the usual and customary ones ordinarily made and granted in such cases, and were made under and by the authority in the bill of lading conferred upon the respondent and upon the collector of the port, and in accordance with the provisions of law and the regulations of the Treasury Department in that behalf."

"14. Under these several orders and permits, a portion of the cargo of the Egypt, including libellants' merchandise, was discharged and landed upon the Inman dock, where the same was destroyed by fire about two o'clock the next morning. That said cargo, including said merchandise belonging to

libellants, was at the time of its destruction aforesaid, in the possession of the respondent, and had never been taken into the possession of the collector of the said port of New York. That said fire broke out without any imputed negligence, and that by it the steamer was also somewhat burned.

"15. That between the arrival of the steamer and the destruction of the merchandise there was not sufficient time in which to enter libellants' goods at the custom-house, pay the duties thereon, and obtain the requisite permits for the removal of the same. That, in fact, no duties were paid upon libellants' goods, and no permits obtained prior to the destruction of the goods by fire; that said goods were at the time of their destruction 'unpermitted' goods.

"16. That upon obtaining the permits referred to, the respondent's custom-house broker caused a notice of the time and place of discharge to be posted on the bulletin board of the custom-house. It is usual to so post such notices. It is not usual to publish them in the newspapers.

"17. No notice was ever sent to or received by the libellants, nor did they have any actual knowledge of the readiness to discharge, or of the time or place of discharge of the Egypt upon her arrival.

"18. Libellants never knew that the merchandise had been landed and deposited upon the Inman dock, and never had an opportunity of removing such merchandise."

The other facts, so far as they are material, are stated in the opinion of the court.

Upon such facts the Circuit Court found, as conclusions of law, that respondent had the right to dock and discharge the Egypt at the Inman pier; that it was exempt from liability for the goods destroyed by fire on such pier; and that there was, by reason of the application to the collector to allow the unpermitted cargo to remain on the wharf, no valid agreement or binding obligation to pay the libellants the value of the goods burned.

*Mr. Joseph H. Choate* for appellants.   *Mr. William V. Rowe* and *Mr. Treadwell Cleveland* were with him on his brief.

*Mr. James C. Carter* for appellee.   A brief for the same was also filed by *Mr. John Chetwood.*

MR. JUSTICE BROWN delivered the opinion of the court.

This case involves the liability of a steamship company for the loss by fire of a consignment of goods unloaded without personal notice to the consignee upon the wharf of a company other than the one owning the vessel.

By the Limited Liability Act, Rev. Stat. § 4282, no ship owner is liable to answer for the loss of any merchandise shipped upon his vessel by reason of any fire " happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner," and in the case of *The Scotland,* 105 U. S. 24, the exemptions and limitations of this act were held to apply to foreign as well as domestic vessels.   A similar exemption from fire happening without the " fault or privity " of the owner is contained in the British Merchants' Shipping Act of 1854, 17 and 18 Vict. c. 104, § 503.   The bill of lading in this case also contains an exemption of liability from loss caused by fire " before loading in the ship or after unloading."   There is no comma after the word " loading " or " ship," but obviously it should be read as if there were.   In view of the fact that, under no aspect of the case would the owner of the vessel be liable for the consequence of any fire occurring on board of such vessel without his fault, and that an attempt is made in this case to impose the liability, not of a warehouseman, but of a common carrier and insurer against fire, after the contract of carriage had been fully performed, it would seem that such liability ought not to be raised out of the contract in this case except upon clear evidence, and for the most cogent reasons.   The liability of the company for the goods while upon the wharf is a mere incident to its liability for them while upon the ship, and if the liability is more extensive under the incidental contract of storage than it was under the principal contract of carriage, it is an exception to the general rule that the incidental liability of a contracting party is not broader than his liability upon the principal contract.

Two facts are mainly relied upon in this case for holding the respondent company to the liabilities of an insurer:

1. That the Egypt did not unload at her usual wharf, but at what is known as the Inman pier, and that no actual notice was given to the libellants of such unloading.

2. In the application to the collector to allow the unpermitted cargo of the steamer to remain upon the wharf for forty-eight hours there was a stipulation that it should be "at the sole risk of owners of said steamer."

We shall proceed to dispose of these questions in their order.

1. As bearing upon the liability of the vessel after the cargo is unladen the following exemptions in the bill of lading are pertinent and necessary to be considered:

(1) "Fire before loading, in the ship, or after unloading."

(2) "The National Steamship Company, (Limited,) or its agents or any of its servants are not to be liable for any damage to any goods which is capable of being covered by insurance."

(3) "The goods to be taken from alongside by the consignee immediately the vessel is ready to discharge, or otherwise they will be landed by the master and deposited at the expense of the consignee and at his risk of fire, loss, or injury in the warehouse provided for that purpose, or in the public store, as the collector of the port of New York shall direct, and when deposited in the warehouse or store, to be subject to storage, the collector of the port being hereby authorized to grant a general order for discharge immediately after entry of the ship."

It is admitted that, under what may be termed the common law of the sea, a delivery of the cargo, to discharge the carrier from his liability, must be made upon the usual wharf of the vessel and actual notice be given to the consignee, if he be known. This was the ruling of this court in the case of *The Tangier*, (*Richardson* v. *Goddard*,) 23 How. 28, 39, and *The Eddy*, 5 Wall. 481, and is in conformity with the great weight of English and American authority. *Hyde* v. *Trent and Mersey Navigation Co.*, 5 T. R. 389; *Gibson* v. *Culver*, 17 Wend. 305; 1 Parsons on Shipping, 222.

This rule, however, originated prior to the era of steam navigation, when a voyage from Liverpool to New York rarely consumed less than three weeks; when the time of the arrival of the vessel could not be forecast with any accuracy; when crews were discharged immediately upon her arrival; and the vessel was usually detained several weeks in the slow and laborious process of unloading, taking on cargo, and refitting before setting out upon another voyage. Such methods of delivery were found wholly inadequate to the necessities of modern commerce, and particularly to the comparatively short voyages of the large transatlantic passenger steamers, which are kept permanently equipped with large and expensive crews, at a cost of several hundred dollars per day, and in order to be profitably employed must be kept in almost constant motion. In such cases the consignees of the cargo may be numbered by the hundreds, and a requirement that each consignee shall have a personal notice of the unloading of the cargo, in order to relieve the carrier from responsibility, would necessitate delays which might consume the entire profits of the voyage. It is of the utmost importance that the discharge of the cargo shall begin as soon as possible after the vessel arrives at her wharf, and if the consignee may sometimes be spurred to greater diligence, or put to some inconvenience in removing his consignments, he receives a compensation in the lower rate of freight the vessel is thereby enabled to charge.

To obviate the difficulties attendant upon the ancient method of discharging, the regular steamship lines are in the habit of providing themselves with wharves having covered warehouses, into which the cargo is discharged, and of inserting in their bills of lading stipulations similar to those found in this case, viz., that the responsibility of the vessel shall cease after the goods are discharged, and thus of extending their statutory exemption from fire to such as may occur before loading or after unloading. In view of the fact that the piers of the regular steamship lines are well known to every importer, and the day of arrival of each steamer may be predicted almost to a certainty, we perceive nothing unreasonable in this stipulation. An importer, having reason to anticipate

the arrival of goods by a certain steamer, by putting himself in communication with the office of the company, may usually secure a notice of several hours of the actual arrival of the vessel at her wharf. It seems, too, by the sixteenth finding in this case, that, in lieu of a personal notice to each consignee or of publication through the papers, a custom has grown up in the port of New York of posting on a bulletin board in the custom-house a notice of the time and place of discharge. Taking all these facts into consideration, we see no impropriety in the company limiting itself to the liability of a warehouseman with respect to the goods so discharged into its own warehouse. Indeed, as applied to the usual wharf of the steamer, we do not understand it to be seriously questioned in this case. In fact, an argument appears to have been made in the District Court to the effect that the Limited Liability Act applied to this fire to exonerate the company, but the court held, and doubtless properly, that a fire originating upon the dock could not be said to have "happened to the ship" within the meaning of section 4282, even though the fire extended to and did some damage to the vessel. *Morewood* v. *Pollok*, 1 El. & Bl. 743. No good reason, however, is perceived why, if a wise policy requires the exemption of the carrier from a fire occurring without his fault, such exemption should not extend to any such fire while the goods are in his possession and under his control, or at any time before actual delivery to the consignee. But, however this may be, there can be no question of the power of the carrier to extend his statutory exemption from fire to such as occur after the discharge of the cargo, by special stipulation to that effect in the bill of lading. Thus in *York Co.* v. *Central Railroad*, 3 Wall. 107, it was held that the common law liability of a carrier might be limited by special contract with the owner, and that the exemption in a bill of lading from losses by fire was sufficient to protect the carrier, if the fire were not occasioned by any want of due care on his part. See also *The Lexington*, (*New Jersey Steam Navigation Co.* v. *Merchants' Bank*,) 6 How. 344, 382; *Railroad Co.* v. *Manufacturing Co.*, 16 Wall. 318; *Phœnix Ins. Co.* v. *Erie Transportation Co.*, 117 U. S.

312. Indeed, a general exemption from the consequences of fire has been held to extend not only to fires happening on board the vessel, but to fires occurring to the goods while on the wharf awaiting transportation. *Scott* v. *Baltimore &c. Steamboat Co.*, 19 Fed. Rep. 56.

No rule is better settled than that the delivery must be according to the custom and usage of the port, and such delivery will discharge the carrier of his responsibility. Thus in *Dickson* v. *Dunham*, 14 Illinois, 324, it was said that "it was competent for the defendant," the carrier, "to set up a custom or usage in the port of Chicago, that goods should be delivered at the wharf selected by the master of the vessel, and that consignees should receive their goods there, with the averment of knowledge of such a custom in the plaintiff, and that this contract was made in accordance with it." So also in *Gatliffe* v. *Bourne*, 4 Bing. (N. C.) 314, 329, Chief Justice Tindall said: "We know of no general rule of law which governs the delivery of a bill of goods under a bill of lading, where such delivery is not expressly according to the terms of the bill of lading, except that it must be a delivery according to the practice and custom usually observed in the port or place of delivery." See also *Farmers' and Mechanics' Bank* v. *Champlain Transportation Co.*, 23 Vermont, 186; *The Tangier*, 1 Cliff. 396; *Richmond* v. *Union Steamboat Co.*, 87 N. Y. 240; *Gibson* v. *Culver*, 17 Wend. 305; *The Boston*, 1 Lowell, 464. In *The Sultana* v. *Chapman*, 5 Wisconsin, 454, there was a delivery at a place where the court held the boat had no right to leave the goods, and they were there destroyed. Under such circumstances, notwithstanding the exception in the bill of lading, the carrier was held not to be exempted from liability for the loss. "He had no right," said the court, "to place these goods where he did; and having done so, and a loss having ensued, he must be held responsible for it, as being occasioned by his own negligence or misconduct."

While there is no express provision in the bill of lading in this case dispensing with notice to the consignee, the provision that the goods shall be taken from alongside by the consignee immediately the vessel is ready to discharge, is inconsistent

with the idea of personal notice, since such a notice would necessitate a delay of one or two days in the discharge of the cargo, while the notices were being given. If the goods were not taken by the consignee the carrier. was authorized to deposit them at the risk of the consignee "in the warehouse provided for that purpose," meaning, of course, the warehouse upon the pier. His obligation to give notice, if any such existed, must, under the terms of the bill of lading allowing an immediate discharge of the cargo, be cotemporaneous with such discharge, and too late to be of any avail to the consignee. Such notice appears to have been given in this case, as the libellants' broker in his testimony, to which we have been referred, says: "The invoice and bills of lading were sent down to me on the 31st of January, and the entries made out, . . . and lodged in the custom-house at twenty-five minutes past two." In *Gleadell* v. *Thomson*, 56 N. Y. 194, 197, it was said of a similar stipulation in a bill of lading, that the goods should be taken from alongside by the consignee immediately the vessel is ready to discharge: "The landing of the goods upon the pier of the plaintiff, under the circumstances of this case, did not, we think, change his relation to the goods, and divest him of his custody of them as a carrier. The privilege to make this disposition of them was secured to him by the bill of lading, unless the consignee was ready to take the goods from the ship whenever it was ready to discharge. It was not incumbent upon the plaintiff to give notice of a readiness to discharge the goods as a condition of his exercising the privilege of depositing them upon the pier. They, however, remained after such deposit in his custody as carrier, subject to the modified responsibility, created by the contract, until after notice had been given to the consignees of their arrival, and a reasonable time had elapsed for their removal. Meanwhile the defendants assumed the risk of 'fire, loss, or injury' to the goods, according to the contract, but the language used did not exempt the plaintiff from liability for an injury resulting from his own negligence."

The cases relied upon by the libellants do not support their contention. In the case of *The Santee*, 7 Blatchford, 186, a

bill of lading covering a shipment of cotton, contained a clause that the cotton should be at the risk of the consignee as soon as delivered from the tackles of the vessel at the port of destination. It appeared that the consignee had proper notice of the arrival of the vessel, and of her discharge, and an opportunity by reasonable diligence to identify his cotton and receive it. The cotton was placed safely on the wharf, when discharged, and a portion of it, belonging to the libellants, was removed by some other person, but was not actually delivered by the agents of the vessel to such other party. It was held that the vessel was not liable for the loss. It is true that, in delivering the opinion, it was said the carrier was still bound to give suitable information to the consignees, to enable them to attend and receive the goods, and themselves assume and exercise that care and responsibility of which the carrier was to be relieved. But notice in this case was admitted to have been given, and the only question was whether under the bill of lading the carrier was liable after the cotton was discharged, and it was held that he was not. Nor was he " bound to watch the property after it passed beyond the vessel's tackles, to see that it was kept safe or protected from removal through mistake or design, by third persons."

In *Collins* v. *Burns*, 63 N. Y. 1, the bill of lading contained a stipulation much like the one under consideration, and it was held that the clause providing for immediate discharge into the warehouse at the risk of the consignee of fire, loss, or injury, did not exonerate the carrier for delivering goods to the wrong party, or to a drayman who was not authorized to receive them. The Court of Appeals, however, held expressly that the liability of defendants was that of warehousemen, and, therefore, that they were responsible only for negligence.

So in *Tarbell* v. *Royal Exchange Shipping Co.*, 110 N. Y. 170, the goods were discharged from the ship and deposited on a proper wharf, and after the consignees had had three full days to remove them, it was discovered that a part had been removed from the wharf by some one without the authority of the consignees. It was held that, as the loss occurred after the lapse of a reasonable time for removal of

the goods by the consignees, after notice of arrival, defendant was not liable as a common carrier, but that the defendant was negligent in omitting to take ordinary care of the goods, and allowing them to be removed without taking receipts. It was expressly held, however, that the liability of defendant as carrier terminated with the delivery of the goods upon the wharf, and that its liability arose from its negligence in delivering them to the wrong person.

It is claimed, however, that the berthing of this ship at a pier other than her own was in legal effect a deviation, which rendered the company an insurer of the cargo discharged at such pier without notice, until its actual delivery to the consignee. In the law maritime a deviation is defined as a "voluntary departure without necessity, or any reasonable cause, from the regular and usual course of the ship insured." 1 Bouvier's Law Dict. 417; *Hostetter* v. *Park*, 137 U. S. 30, 40; *Davis* v. *Garrett*, 6 Bing. 716; *Williams* v. *Grant*, 1 Connecticut, 487; as, for instance, where a ship bound from New York to Norwich, Conn., went outside of Long Island, and lost her cargo in a storm, *Crosby* v. *Fitch*, 12 Conn. 410; or where a carrier is guilty of unnecessary delay in pursuing a voyage, or in the transportation of goods by rail. *Michaels* v. *N. Y. Central Railroad*, 30 N. Y. 564. But, if such deviation be a customary incident of the voyage, and according to the known usage of trade, it neither avoids a policy of insurance, nor subjects the carrier to the responsibility of an insurer. *Oliver* v. *Maryland Ins. Co.*, 7 Cranch, 487; *Columbian Ins. Co.* v. *Catlett*, 12 Wheat. 383. In *Hostetter* v. *Park*, 137 U. S. 30, it was held to be no deviation, in the Pittsburg and New Orleans barge trade, to land and tie up a tow of barges, and detach from the tow such barge or barges as were designated to take on cargo *en route*, and to tow the same to the several points where the cargo might be stored, it having been shown that such delays were within the general and established usage of the trade. So, in *Gracie* v. *Marine Ins. Co.*, 8 Cranch, 75, it was held to be no deviation to land goods at a lazaretto or quarantine station, if the usage of the trade permitted it, though by the bill of lading the goods were "to be safely

landed at Leghorn." See also *Phelps* v. *Hill*, 1 Q. B. D. (1891) 605.

In this connection the findings are :

(3) That the regular English steamship lines usually dock at their own piers, but not always, and, in case of any emergency, dock elsewhere, and permit each other, when the necessity arises, to use the exclusive dock of each. (7) That for a month or more before January 31, 1883, respondent had been blocked up at its own pier, No. 39, in consequence of heavy cargoes, delays of its vessels by westerly winds and ice in the slips, and had, in consequence, been obliged to discharge two of its vessels at outside uncovered piers. (9) That steamers of regular lines, on their arrival at the port of New York, if their docks are blocked, are not kept in the stream longer than to enable them to berth elsewhere. If kept in the stream consignors make great complaint. It was more costly to dock the Egypt at pier No. 36, but it was done to secure to the consignees a more prompt discharge and delivery of their goods. (26) That pier No. 36, North River, was a fit and proper place to discharge the steamship Egypt at the time in question and to discharge from her libellants' goods.

If it be true that the pier of the respondent company was so blocked that the Egypt could not obtain access to it to discharge her cargo, it was, so far from being a deviation, a matter of ordinary prudence to select a neighboring pier for that purpose. Had this cargo been discharged at a remote, unusual, or inaccessible spot, or upon an uncovered pier, so that it was exposed to the weather or to any unusual hazard, and a loss had been incurred, we should not have hesitated to hold the carrier liable, notwithstanding the stipulation against the consequence of negligence in its bill of lading. *Railroad Co.* v. *Lockwood*, 17 Wall. 357, 359; *The Aline*, 19 Fed. Rep. 875; *The Boskenna Bay*, 22 Fed. Rep. 662. No such question, however, is presented here. While the libel alleges that the loss occurred through the negligence of the respondent, no effort was made to prove this, and there is no finding that such was the case. Indeed, there is nothing to indicate that the Inman pier was not a perfectly proper place to

discharge a cargo, or that it was not equipped with the usual appliances for the extinguishment of fires.

It is insisted, however, that libellants had a right to suppose that the Egypt would discharge her cargo at her regular pier, and that, while they might be bound to take notice of that fact, they were entitled, if she selected another pier, to a personal notice of the time and place of delivery, that an opportunity might be given them to be present and receive their consignments. But if, under the usages of trade or the necessities of the particular case, it was allowable and proper for the respondent to select another pier for the discharge of its cargo, we do not understand that its obligation to its consignees was thereby increased or modified, at least unless the libellants can show that they were actually prejudiced by such change. Practically the same questions are involved, viz., whether if she had discharged at her own wharf, the company was bound to give notice before it could relieve itself of its responsibility. The real question still is whether, if she had gone to her own wharf, and the fire had occurred under the same circumstances, the vessel would have been liable for the loss. It was for the mutual advantage of the ship and the consignees that the cargo should be unloaded at the earliest possible moment — the ship, that she might discharge herself of responsibility and take on her return cargo — the consignees, that they might secure their goods as soon as possible. The North River piers in that neighborhood were all used by steamers engaged in the Liverpool trade. The pier selected was only six hundred feet from the regular pier of the line, and inquiry at that pier would doubtless have apprised libellants, or their agent, where the Egypt was actually discharging her cargo.

In addition to this there is a finding that, upon obtaining the permits for the immediate unloading of the cargo, the respondent's custom-house broker caused a notice of the time and place of discharge to be posted on a bulletin board in the custom-house; that it is usual to post such notices, and is not usual to publish them in the newspapers. It is true there was an exception taken to this finding upon the ground that there

was no evidence in support of it. The testimony, however, of the witness Ryor, the custom-house broker, was to the effect that he attended to getting out the usual papers for the respondent company to allow the discharge and to passing all their steamers through the custom-house; that, on the arrival of the Egypt, the captain brought the manifest, took the usual oath, and made out applications for the usual permits to land goods, discharge at night, and to allow the goods to remain on the wharf. "We get the permit taken out, signed by the naval officer and collector, and after the permits are all taken out, we usually post a notice where the vessel will discharge (giving copy of notice). I have no reason to suppose the notice was not posted in this case. It is done in every case. I am not positive whether it was done in this case, but it is a part of the routine of entering a vessel to do so. I have no doubt it was done." The witness evidently had no definite recollection of this particular notice, but he had no doubt that he pursued his usual course in posting it. Respondent's agent also testifies that it was always usual to put up such notice at the custom-house. The custom-house broker for the libellants, Arnold Constable & Company, testified in this connection that the invoice and bills of lading of the Egypt were sent down to him on January 31; that the entries were made and lodged in the custom-house at twenty-five minutes past two. "I knew where the board is where they put up notices of arrivals and the steamer's discharge. . . . That is around the corner going into the cashier's office. . . . It isn't any great distance. . . . I never look at that unless I want to find out where a vessel was discharged, a strange vessel; possibly I might look then; I have not looked there for years." While this testimony is not direct and positive to the fact sought to be proven, it creates, when aided by the ordinary presumption arising from the course of business, a strong probability that the notice was posted. The practice, even of a private office, if well established, is presumed to have been followed in individual cases, and is accepted as sufficient proof of the fact in question when primary evidence of such fact is wanting. 1 Greenl. Ev.

§ 40; *Nicholls* v. *Webb*, 8 Wheat. 326; *Price* v. *Torrington*, 1 Salk. 285; *Champneys* v. *Peck*, 1 Stark. 404; *Pritt* v. *Fairclough*, 3 Camp. 305; *Doe* v. *Turford*, 3 B. & Ad. 890, 895; *Dana* v. *Kemble*, 19 Pick. 112. We think the conclusion of the court was justified by the evidence in this particular.

But, even supposing that actual notice had been given, it could not have been given before the arrival of the ship, and the names of the consignees were known, and it would then have been too late for the libellants to take their goods away. The findings are that the Egypt was entered at the custom-house at forty-five minutes past one in the afternoon; that she began to discharge her cargo at half-past four, and that libellants' merchandise was discharged prior to the fire. (15) And that between the time of the arrival of the steamer and the destruction of the merchandise, there was not sufficient time in which to enter the libellants' goods at the custom-house, pay the duties thereon, and obtain the requisite permits for the removal of the same. If, then, it be true that libellants could not have removed their goods before the fire, it is difficult to see how the want of a notice could have contributed to the loss. We are clearly of the opinion that, under the custom of the port and exigencies of the service, there was no obligation to delay the discharge of the cargo until notice could be given, and a reasonable time had elapsed before the goods could be taken away. While the nineteenth finding is to the effect that libellants had, before this consignment, received from the respondent company six other consignments under bills of lading in the same form, all of which were landed and discharged on their own pier, there is nothing to indicate that libellants took any steps whatever upon the faith of such previous practice, made any inquiries as to when the Egypt was expected, or at what pier she would discharge her cargo. Indeed, while their own broker was at the custom-house attending to the entry of these goods, he did not even take the trouble to look at the bulletin to see where the Egypt was being discharged. If libellants had shown that, relying upon the previous practice, they were ready at pier No. 36 to receive the cargo, or were misled by

the discharge at pier No. 39, they would have shown a much stronger title to recover. The inference is irresistible that, even if the Egypt had discharged at her own wharf, they would not have been there to receive, and could not have received their consignments, which would have been stored in the company's warehouse, and exposed to the same danger of fire — in other words, the delivery at the Inman dock did not in any legal sense contribute to the loss. There was no stipulation in the bill of lading that the Egypt would unload at No. 36, from which a duty to give notice might be implied, if she were compelled to select another pier.

Upon the facts of this case exhibiting a necessity for a discharge elsewhere than at her own pier, and in the absence of any evidence that libellants were prejudiced by the failure of the Egypt to discharge at her usual wharf, we think there was no breach of duty on the part of respondent in this particular.

2. Another serious question, however, is presented by the proviso in the application to allow the unpermitted cargo to remain upon the wharf, viz., that it should remain "at the sole risk of owners of said steamer, who will pay the consignee or owner the value of such cargo respectively as may be stolen, burned, or otherwise lost, and who will also pay all duties on cargo which may be in any way lost by so remaining."

It seems that, upon the arrival of a transatlantic steamer, it is usual to apply for and obtain a general order to allow to be landed and sent to the public store (not the warehouse on the wharf) all packages for which no special permit or order shall have been received; also, a permit to allow such portion of the cargo as is unladen, but not permitted, to remain upon the wharf for forty-eight hours from the time of the granting of the above general order, at the expiration of which time they are sent to the proper general order store; and also a special license to permit the cargo to be unladen at night. These orders, licenses, and permits are granted in pursuance of the general regulations of the Treasury Department.

Granting that the request made by the company is, upon

its face, broad enough to impose upon the company the responsibility for goods lost by fire, it must be construed in connection with the following stipulation upon the same subject in the bill of lading, viz.: "The goods to be taken from alongside by the consignee immediately the vessel is ready to discharge. . . . The collector of the port being hereby authorized to grant a general order for discharge immediately after entry of the ship. The United States Treasury having given permission for goods to remain forty-eight hours on wharf at New York, any goods so left by consignee will be at his or their risk of fire, loss, or injury."

Some criticism is made upon the words "so left by consignee," libellants insisting that the word "left" implies a voluntary leaving of the cargo upon the wharf after notice of the discharge of the same has been received by the consignee. We are not inclined, however, to affix to it such a technical meaning. In view of the fact that the object of the stipulation was evidently to exempt the carrier from responsibility for fire occurring at any time after the discharge of the cargo, and particularly during the forty-eight hours they were permitted to remain upon the wharf, which forty-eight hours, under the terms of the permit, began to run from the time of the general order to unload was granted, we think it clear that it was intended to apply during this time, whether the goods were technically "left" by the consignee or not, and that the proviso should be interpreted as if it read: "The United States Treasury having given permission for goods to remain forty-eight hours on wharf at New York, any goods so remaining will be at consignee's risk of fire, loss, or injury." This permission, though granted at the request of the ship owner and primarily for his benefit, is really of more value to the consignees, since a convenient opportunity is there afforded them to examine their goods, and they are saved the expense of cartage to a bonded warehouse and storage therein.

The question presented then is substantially this: A and B agree that in a certain contingency A shall assume the risk of the loss of his goods by fire. Subsequently B agrees with C

that, in precisely the same contingency, he shall be responsible to A for the loss of the same goods. Waiving the question whether this means any more than that he shall be responsible so far as C is concerned, does the latter contract supersede the earlier? Unquestionably it would, if it were between the same parties. In this case, however, the first contract was made by B (the respondent) in full contemplation of the fact that it would be obliged to enter into the second, and for the special purpose of providing against it. Now, to say that, having entered into the first contract, knowing that it would have to enter into a second one wholly inconsistent with the first and intending to be bound by it, is scarcely creditable to the intelligence of its agent. Libellants, too, though parties, or rather privies to the first contract, were not parties to the second, and so far as it appears did not even know that it was or would be entered into, except as they may have known a general usage to protect officers in this manner. The position of the parties had not changed in the interval; no new consideration moved from the libellants; and while the contract was nominally made for their benefit, this gift of the collector was purely a voluntary one. Indeed, the contract seems really to have been for the protection of the collector himself. Under these circumstances it is clearly the duty of this court to harmonize these contracts, if it be possible to do so. It is by no means a universal rule that a person may sue upon a contract made for his benefit, to which he was not a party. *Hendrick* v. *Lindsay*, 93 U. S. 143; *National Bank* v. *Grand Lodge*, 98 U. S. 123; *Keller* v. *Ashford*, 133 U. S. 610; *Cragin* v. *Lovell*, 109 U. S. 194; *Willard* v. *Wood*, 135 U. S. 309. No case has gone so far as to hold that, where the person for whose benefit the contract is made, has himself or by his privy in estate entered into a contract inconsistent with this, he may repudiate such prior contract, and claim the benefit of the second simply because it has become for his interest to do so. We know of no principle which authorizes one party to an agreement to vary it, even against his own interest, without the consent of the other. As observed by the Court of Appeals of New York, in *Simpson* v. *Brown*, 68 N. Y. 355: " It is not

every promise made by one to another, from the performance of which a benefit may inure to a third, which gives a right of action to such third person, he being neither privy to the contract nor to the consideration. The contract must be made for his benefit *as its object* and he must be the party intended to be benefited." See also *National Bank* v. *Grand Lodge*, 98 U. S. 123; *Garnsey* v. *Rogers*, 47 N. Y. 233.

The principle above announced was still further limited by the Court of Appeals in *Vrooman* v. *Turner*, 69 N. Y. 280, in which it was said that, to give a third party, who may derive a benefit from the performance of a promise an action, there must be — *first*, an intent by the promisor to secure some benefit to the third party; and, *second*, some privity between the two, the promisor and the party to be benefited, and some obligation or duty owing from the promisor to the latter, which would give him a legal or equitable claim to the benefit of the promise, or an equivalent to him personally.

It is necessary to a correct understanding of this contract to examine somewhat in detail the circumstances under which it was entered into, and the authority under which the collector acted in prescribing its terms. By Revised Statutes, sections 2867 and 2869, general authority is given to the collector to authorize the unloading of vessels arriving within the limits of their collection districts, and to grant a permit to land the merchandise. By section 2966 the collector is authorized to take possession of such merchandise, and deposit the same in bonded warehouses, and by section 2969 all merchandise of which the collector shall take possession under these provisions shall be kept with due and reasonable care at the charge and risk of the owner. By section 2871 the collector, "upon or after the issuing of a general order," (for the unloading of the cargo,) "shall grant, upon proper application therefor, a special license to unlade the cargo of said vessel at night, that is to say, between sunset and sunrise," upon a bond of indemnity being given, etc., "and any liability of the master or owner of any such steamship to the owner or consignee of any merchandise landed from her shall not be affected by the granting of such special license or of any general order, but such liability

shall continue until the merchandise is properly removed from the dock whereon the same may be landed." There is certainly nothing here which contemplates that the owner of the vessel shall enter into any independent obligation, assuming new liabilities or expanding in any way existing liabilities, to the consignee. The object of the statute is clearly to preserve the *status quo ;* to continue such liability as already exists and to preclude the ship owner from claiming that, by the action of the collector, his liability to the owner of the merchandise is impaired or restricted. In the language of the statute, any previous liability " shall not be .ffected;" " but such liability shall continue until the merchandise is properly removed from the dock whereon the same may be landed." It is true that no mention is here made of the power of the collector to allow the unpermitted cargo to remain forty-eight hours upon the wharf, and no such power is expressly given ; but by section 2989 " the Secretary of the Treasury may from time to time establish such rules and regulations, *not inconsistent with law,* for the due execution of the provisions of this chapter, and to secure a just accountability under the same as he may deem to be expedient and necessary." While there is nothing in the statute allowing any fixed time to elapse between the unlading of the goods and their removal to a bonded warehouse, the statute does not prohibit such time being allowed, and as some interval must necessarily elapse for the examination and appraisement of the goods designed for immediate delivery to the importer — duties which can most readily be performed while the goods are yet upon the wharf — and as it is for the mutual benefit of the government and consignee to allow some such interval of time to elapse, the Secretary of the Treasury is doubtless vested with a certain discretion in that particular, under the power given him by section 2989, and also by section 251, which authorizes him to make rules and regulations not inconsistent with law in carrying out the provisions of law relating to raising revenue from imports.

In pursuance of this authority the Secretary of the Treasury, on May 5, 1877, adopted certain regulations concerning the discharge of steamships, of which the following only is mate-

rial : " Goods will be delivered from the docks by the inspector as fast as permits therefor are presented, and such as are discharged for which no delivery permit has been received will be sent to the general-order store.   The collector may, at the request of the master, agent, or owner of the vessel, allow goods landed but not 'permitted' to remain on the docks, at the sole risk of the owner of the vessel, not longer than forty-eight hours from the time of their discharge, upon the production of evidence that the owner of the vessel assumes the risk of the goods allowed to remain and agrees to pay the duties on any goods which may be lost by so remaining.   This request must be made in writing to the collector, and must state that if the permission is granted the goods will be at the risk of the owner of the vessel ; that he will pay all duties on goods that may be lost, and must be signed by the owner of the vessel or his agent duly authorized.   The consent of the collector thereto must also be granted in writing.   At the expiration of the forty-eight hours, no permit having been received for their delivery by the inspector, the collector shall send the goods to the general-order store to have the same weighed or gauged, if required."

In this connection it must be borne in mind that the Secretary of the Treasury is an officer of the government; that his powers are limited by law ; that his duty is to protect the revenues of the government and to prevent smuggling or other illegal practices, whereby the government may be defrauded of its revenue ; and that he owes no duty to individuals beyond seeing that their rights are not prejudiced any further than is necessary by the action of the customs officers. He is neither the agent of the vessel nor of the importer, but stands between them, representing only the government and charged only with the collection of its revenue.   The above regulation, when carefully examined, is consistent with this view.   It requires the collector to allow the goods to remain upon the docks " at the sole risk of the owner of the vessel," and requires the latter to assume " the risk of the goods allowed to remain," and to agree " to pay the duty on any goods which may be lost by so remaining."   It is obvious

from the context that the risk referred to is the risk as between the owner of the vessel and the government, viz., the risk of paying duties upon such goods as may be lost during the forty-eight hours. The permit is granted primarily for the benefit and at the request of the vessel, which retains its lien for freight for the goods so long as they remain on the dock. The government has as yet no claim for duties against the consignee of the goods, and it is just that the owner of the vessel should assume the liability for duties. There is nothing here indicating an intention of imposing any liability upon the ship owner for the goods themselves, except so far as to protect the government from loss. The loss referred to is probably a loss by theft, to which these warehouses are peculiarly subject, since, if the goods were destroyed by fire, the consignee would, under section 2984, be entitled to an abatement or refund of duties. This construction of the ship owner's obligation is rather emphasized than otherwise by the subsequent clause of the regulation: " This request must be made in writing to the collector, and must state that if the permission is granted the goods will be at the risk of the owner of the vessel; that he will pay all duties on goods which may be lost," etc. The risk he thus assumes is the risk of paying the duties upon goods which may be lost. There is nothing in these instructions, interpreted in the light of the statute and of the powers of the collector, to justify the inference that it was intended to impose any new or different obligation upon the owner of the vessel, with respect to the consignees of the merchandise.

In the forms prescribed, probably by the department, to carry out these regulations, however, there is an apparent departure both from the language of the statute and the Treasury regulations, in the obligation the owner of the vessel is required to assume, " to pay to the consignee or owner the value of such cargo respectively as may be stolen, *burned,* or otherwise lost, and also pay all duties on cargo which may be in any way lost by so remaining." Here the obligation to indemnify the consignee first appears and occupies the most prominent place, and is extended to goods stolen, burned, or

otherwise lost, while the obligation to pay duties is mentioned rather incidentally than otherwise. Wherever, or by whomsoever these forms were prepared, we must, for the purposes of this case, treat them as the act of the collector, who, if this contract be construed as intended for the protection of any one but the collector himself, clearly exceeded his authority in requiring the owner of the vessel to assume, as against the consignee, the risk of their being burned while upon the wharf. As the Circuit Court finds that "such application was in the form required by said collector, without which permit would not be granted, and the entire cargo would be sent to the public store," it cannot be treated as the voluntary act of the ship owner any further than this contract or obligation conformed to the requirements of the statute or the Treasury regulations, which were designed, as we have already stated, only to preserve the previous rights of the consignee against the owner of the steamship unimpaired by the action of the collector. Beyond this it must be treated either as obtained by duress, or so plainly inconsistent with the previous agreement of the parties *inter sese* as to be of no avail to the consignee.

It is a familiar doctrine in this court that a bond or other obligation extorted by a public officer, under color of his office, cannot be enforced, and the remarks of this court in the case of *United States* v. *Tingey*, 5 Pet. 115, 129, are pertinent in this connection. In this case the Navy Department caused a form of bond, not prescribed by law, to be prepared and transmitted to one Deblois, a person to whom the disbursement of public moneys was entrusted as purser, to secure fidelity in his official duties, with a condition that it should be executed by him with sufficient sureties before he should be permitted to remain in office, or to receive the pay or emoluments attached to the office. "The substance of this plea," said the court, "is, that the bond, with the above condition, variant from that prescribed by law, was, under color of office, extorted from Deblois and his sureties, contrary to the statute, by the then Secretary of the Navy, as the condition of his remaining in the office of purser, and receiving its

emoluments. There is no pretence then to say, that it was a bond voluntarily given, or that, though different from the form prescribed by statute, it was received and executed without objection. It was demanded of the party, upon the peril of losing his office; it was extorted under color of office, against the requisitions of the statute. It was plainly then an illegal bond; for no officer of the government has a right, by color of his office, to require from any subordinate officer, as a condition of holding office, that he should execute a bond with a condition different from that prescribed by law. That would be, not to execute, but to supersede the requisitions of law."

A distinction is drawn in this class of cases between a bond compulsorily executed, as in the case under consideration, and a bond or other obligation voluntarily given to the government for which there is no statutory authority. In this latter case the bond has been held to be valid. *United States* v. *Bradley,* 10 Pet. 343, 358; *United States* v. *Hodson,* 10 Wall. 395.

Upon the whole case we are of opinion:

1. That the stipulation in the bill of lading that respondent should not be liable for a fire happening after unloading the cargo was reasonable and valid.

2. That the discharge of the cargo at the Inman pier was not in the eye of the law a deviation such as to render the carrier an insurer of the goods so unladen.

3. That if any notice of such unloading was required at all, the bulletin posted in the custom-house was sufficient under the practice and usages of the port of New York.

4. That libellants, having taken no steps upon the faith of the cargo being unladen at respondent's pier, were not prejudiced by the change.

5. That the agreement of the respondent with the collector of customs to pay the consignees the value of the goods was not one of which the libellants could avail themselves as adding to the obligations of their contract with respondent.

The decree of the Circuit Court is therefore

*Affirmed.*

MR. JUSTICE JACKSON, with whom concurred MR. JUSTICE FIELD and MR. JUSTICE GRAY, dissenting.

I dissent from the judgment and opinion of the court in this case.

The liability of the respondent is not relieved by the provisions of section 4282 of the Revised Statutes, reënacting the first section of the act of Congress of March 3, 1851, as the fire by which the goods were destroyed did not happen " to or on board the vessel." *Morewood* v. *Pollok*, 1 El. & Bl. 743 ; *Salmon Falls Mfg. Co.* v. *Bark Tangier*, 21 Law Reporter, 6.  Nor is the question of the carrier's liability for loss of the goods controlled by any supposed policy of that enactment.

The National Steamship Company, by the contract of affreightment embodied in the bill of lading, undertook not merely to carry, but to *deliver* the thirty-six cases of merchandise in question at the port of New York *unto* the libellants in like good order and condition as received, subject to certain exceptions and conditions, designed to lessen or limit its liability and modify its duty as a common carrier.

The goods were not delivered, either actually or constructively, to the consignees, but were destroyed by fire while still in the custody and possession of the steamship company as carrier, after being landed and deposited on the Inman pier, No. 36, under a special order or permit which the steamship company applied for and obtained from the collector of the port, allowing the goods to remain upon the wharf for forty-eight hours from the time of granting the general order to discharge.

The steamship company, as a common carrier, is, upon well-settled principles, responsible for this loss, unless it is relieved from liability by some special exception or express stipulation in the bill of lading, or by reason of some established or known usage at the port of New York.

The conditions and provisions contained in the bill of lading, so far as the same are material to the present controversy, are as follows :

1.  " Fire before loading in the ship, or after unloading."

2. " The National Steamship Company, or its agents, or any of its servants are not to be liable for any damage to any goods which is capable of being covered by insurance."

3. " The goods to be taken from alongside by the consignee immediately the vessel is ready to discharge, or otherwise they will be landed by the master and deposited at the expense of the consignee and at his risk of fire, loss, or injury, in the warehouse provided for that purpose or in the public store, as the collector of the port of New York shall direct, and when deposited in the warehouse or store to be subject to storage, the collector of the port being hereby authorized to grant a general order for discharge immediately after entry of the ship."

4. " The United States Treasury having given permission for goods to remain forty-eight hours on wharf at New York, any goods so left by consignee will be at his or their risk of fire, loss, or injury."

These provisions of the affreightment contract, modifying and qualifying the carrier's common law liability, must, in accordance with the well-settled rule, be construed strictly. Their meaning is not to be extended by presumption so as to give the carrier protection beyond what has been stipulated for in clear and unmistakable terms. In so far as they are ambiguous or leave the intention of the parties in doubt, they are to be construed against the steamship company. *Edsall* v. *Camden and Amboy Railroad,* 50 N. Y. 661; *Taylor* v. *Liverpool & Gt. Western Steam Co.,* L. R. 9 Q. B. 546; Bishop on Contracts, 411; Carver on Carriers, § 77.

Now, subjecting the terms and stipulations of the bill of lading to the test of this established rule of construction, did they clearly and expressly confer upon the steamship company the right to discharge and deposit the goods upon the Inman wharf at the risk of the consignees, without previous notice to them, or any knowledge on their part, as to when and where the steamer would be docked and its cargo landed?

It is settled by the authorities that it is the duty of the carrier, unless specially relieved from so doing by the contract of affreightment, to give due and reasonable notice to the con-

signee of the time and place of discharging the goods, and to properly separate the different consignments, so as to afford the consignee a fair opportunity to remove the goods, or to put them under proper care and custody.

In *The Eddy*, 5 Wall. 481, 495, the general rule is thus stated by this court: "Delivery on the wharf, in the case of goods transported by ships, is sufficient under our law, if due notice be given to the consignees and the different consignments be properly separated so as to be open to inspection and conveniently accessible to their respective owners. Where the contract is to carry by water from port to port, an actual delivery of the goods into the possession of the owner or consignee, or at his warehouse, is not required in order to discharge the carrier from his liability. He may deliver them on the wharf; but to constitute a valid delivery there the master should give due and reasonable notice to the consignee, so as to afford him a fair opportunity to remove the goods or put them under proper care and custody. When the goods, after being so discharged and the different consignments properly separated, are not accepted by the consignee or owner of the cargo, the carrier should not leave them exposed on the wharf, but should store them in a place of safety, notifying the consignee or owner that they are so stored, subject to the lien of the ship for the freight and charges, and when he has done so he is no longer liable on his contract of affreightment." This statement of the law is reaffirmed in *Ex parte Easton*, 95 U. S. 68, 75, and is fully supported by the authorities both in this country and in England.

Thus in *McAndrew* v. *Whitlock*, 52 N. Y. 40, it was held that a carrier of goods, by water, may land them at a wharf at the port of destination, but not until after he has given the consignee due notice of their arrival and unlading, and afforded him a reasonable time to take charge of and secure them. In the meantime, instead of leaving them on the wharf, it is his duty to take care of them for the owners. See also to the same effect *Zinn* v. *N. J. Steamboat Co.*, 49 N. Y. 442; *The Mary Washington*, Chase, 125; *The Santee*, 7 Blatchford, 186; *Kohn* v. *Packard*, 3 La. 224; *The Tybee*, 1 Woods,

358, 361 ; Angell on Carriers, § 310, and Redfield on Carriers, § 129.

In the present case, as shown by the seventeenth and eighteenth findings of fact, the carrier did not comply with the requirement of the law in giving notice of the time and place the steamer would discharge her cargo, nor did the consignees have any knowledge either of the vessel's readiness to discharge or that their merchandise would be or had been landed and deposited upon the Inman dock ; and the question is whether the special conditions and stipulations of the bill of lading were intended to dispense with such notice, or can be reasonably construed to mean that the carrier was authorized to deposit the goods on the wharf at the risk of the consignees without giving them previous notice, and a reasonable opportunity to take charge of the same.

The only clauses of the bill of lading bearing upon this question are the first, third, and fourth, as above quoted.

The exemption from liability for loss by " fire after unloading," does not, by its terms, confer any authority to deposit the goods upon the wharf without notice to and at the risk of the consignees. The words, " fire after unloading," must receive a reasonable construction. They manifestly do not confer upon the carrier an unqualified discretion as to when and where the cargo may be unloaded. The steamship company could not, for instance, under that provision of the bill of lading, have discharged the goods of the consignee at Brooklyn or Jersey City, and claimed exemption from liability in the event of their destruction by fire while so landed. The clause clearly contemplates, and should be confined to, a lawful unloading, made in the proper execution of the contract to deliver — such an unloading as will conform to the law or usage of the port of destination, or to the special contract of the parties. The generality of its language in this case is to be restricted and interpreted by the subsequent and more particular provision found in the third of the above clauses, directing the disposition to be made of the goods, if the same are not taken from alongside of the vessel when it is ready to discharge. These clauses do not operate to limit the carrier's

duty and obligation as prescribed by law, beyond what is clearly expressed in the terms thereof, or may be fairly implied therefrom. They do not, either singly or collectively, relieve the carrier from its duty to notify the consignees of the time and place of discharging the merchandise; nor do they authorize the carrier to deposit the goods on the wharf at the risk of the consignees without such notice.

In *The Santee*, 7 Blatchford, 186, the bill of lading contained the special clause that the articles named therein should be at the risk of the consignee or owner thereof, as soon as delivered from the tackles of the steamer at her port of destination, and that they should be received by the consignee, package by package, as so delivered. If not taken away the same day they might be sent to a store or permitted to lie where landed, at the expense and risk of the owner or consignee. It was held by the court that, notwithstanding such special contract, it was the duty of the carrier to give reasonable notice to the consignees of the arrival and discharge of the vessel, so as to enable them to attend and receive the goods, and themselves assume and exercise that care and responsibility of which the carrier was to be relieved. The same rule is laid down in *Collins* v. *Burns*, 63 N. Y. 1; *Tarbell* v. *Royal Exchange Shipping Co.*, 110 N. Y. 170; and Wheeler on Carriers, 333.

In *Tarbell* v. *Royal Exchange Shipping Co.*, 110 N. Y. 170, 180, the bill of lading on merchandise from a foreign port contained the provision that the goods were to be delivered from the ship's deck (when the ship owner's responsibility should cease) at the port of New York, and "were to be received by the consignees immediately the vessel is ready to discharge, or otherwise they will be landed and stored, at the sole expense and risk of the consignees, in the warehouses provided for that purpose, or in the public store, as the collector of the port of New York shall direct." The Court of Appeals of New York held that the carrier must, if practicable, give notice to the consignee of the arrival of the goods, and that when this had been done, and the goods had been discharged in the usual and proper place, and reasonable opportunity afforded to the consignee to remove them, the liability of the

carrier as such would terminate, and, in respect to the clauses in question, the court said: "The general duty of a carrier to deliver, and of a consignee to receive, as defined in the authorities to which we have referred, is not, we think, essentially changed by the clause in the bill of lading that the goods are to be delivered from the ship's deck, (when the ship owner's responsibility shall cease,) or by the clause that the goods are to be received by the consignee 'immediately the vessel is ready to discharge.' "

The position taken in the opinion of the court that the clauses in the bill of lading under consideration are inconsistent with the idea of personal notice to the consignees, is not supported by the authorities, but is in direct conflict therewith.

The case of *Gleadell* v. *Thomson*, 56 N. Y. 194, cited in the opinion, is, when analyzed, essentially different from the case at bar. In that case the bill of lading contained the provision that the goods should be taken from alongside by the consignees "immediately the vessel is ready to discharge, or otherwise the privilege is reserved to the vessel *to land them on the pier*, or put them into craft, or deposit them in the warehouse designated by the collector of the port of New York, all at the expense of the consignee, and at his risk of fire, loss, or injury." It was held by the court that it was not incumbent on the carrier to give notice of readiness to discharge the goods as a condition of his exercising the privilege of depositing them upon the pier, and that while so deposited they were, by the terms of the contract, at the consignee's risk of fire, loss, or injury.

This decision means nothing more than that under the alternative privilege reserved to the vessel the carrier had the right to land the goods on the pier at the consignees' expense and risk of fire, loss, or injury, without giving the consignees previous notice or opportunity to take the goods from alongside the ship. The bill of lading in the case at bar contains no stipulation reserving to the vessel the privilege of landing the goods on the pier at the expense and risk of the consignees, as in *Gleadell* v. *Thomson*. The provision of the bill of lading in the present case is that the goods are to be taken from

alongside by the consignees " immediately the vessel is ready to discharge, or otherwise they will be *landed by the master and deposited* at the expense of the consignees, and at their risk of fire, loss, or injury, in the *warehouse provided for that purpose or in the public store*, as the collector of the port of New York shall direct," and when deposited in the warehouse or store to be subject to storage.

If the rule laid down in *Gleadell* v. *Thomson* is sound and applicable to the case under consideration, then, upon its failure or neglect to give the consignees notice of the time and place of discharging the cargo so as to enable them to take their goods from alongside the vessel, the steamship company was bound to *land* and *deposit* the goods in the warehouse provided for that purpose or in a public store, as the collector of the port of New York might direct. If it failed to give the consignees proper notice and opportunity to take the goods from alongside when the vessel was ready to discharge, then the alternative obligation, by the express terms of the contract, was that the master of the steamer should *land* and *deposit* the goods in a warehouse or public store as the collector might direct. No right whatever was reserved in this stipulation to deposit the merchandise upon the pier at the risk of the consignees. On the contrary, the express undertaking on the part of the carrier, by this provision of the contract, was that if the goods were not taken from alongside, the master should land and deposit them in one or the other of the designated places.

The duty on the part of the consignees to take the goods from alongside the vessel necessarily depended upon their having notice of the time and place, when and where, the vessel would discharge her cargo, and be ready to make delivery. When, therefore, the carrier proceeded with the discharge without giving such notice, the alternative stipulation of the contract, as well as its legal obligation under the law, required that the goods should be " landed and deposited " in the manner specified; and the fact that the place for depositing the consignment was specially designated and provided for in event it was not taken from alongside the vessel,

clearly negatives the right of the carrier to deposit it on the wharf at the risk of the consignees. If the steamship company had, without notice to the consignees, landed and deposited the goods in a bonded warehouse, or, as directed by the general order of the collector, in public store 502–510 Washington Street, then the case would have come within the rule laid down in *Gleadell* v. *Thomson*.

There is no finding of fact in this case, supporting the suggestion that the " warehouse," referred to in the third of the above quoted clauses of the bill of lading, was the covered pier or wharf on which the goods were landed. The word " warehouse," wherever used in the bill of lading, is coupled with the words " public store," and it is plainly evident that they have the same meaning. That these words are synonymous, and that " warehouse," when used alone, means a "bonded warehouse" clearly appears in the sections of the Revised Statutes relating to the collection of customs duties. Sections 2954, *et seq*. That no different meaning is given to the word " warehouse," when used in connection with the customs laws, further appears from the definition given it in the standard dictionaries.

It appears by the sixteenth finding of fact that the respondent on the afternoon of January 31, 1883, soon after the entry of the vessel, caused a notice of the time and place of discharge to be posted on a bulletin board in the customhouse; that it was usual to post such notice there, but that it was not usual to publish it in the newspapers; and the conclusion reached by this court is "that if any notice of such unloading was required at all, the bulletin posted in the custom-house was sufficient under the practice and usage of the port of New York."

This conclusion of the court cannot, for several reasons, be sustained. There is no finding of the court below of any practice or usage at the port of New York dispensing with personal notice to the consignees, nor that notice posted at the custom-house would, by any well-established or known usage, charge or affect the consignees with notice. The authorities clearly establish that notice, such as that posted

.upon the bulletin board, must be shown to have come to the actual knowledge of the consignees in order to bind them, or relieve the carrier from the duty of giving personal notice.

In *The Middlesex*, 21 Law Rep. 14, 15; *S. C.* Brunner, 605, 606, it was said by Curtis, J.: "Mere knowledge that the vessel has arrived and is discharging, at a particular wharf, gained in some casual manner by the consignee, without any act on the part of the master, to indicate a readiness to deliver, is not within the usage, which is for the master, or some agent for the vessel, to give notice to the consignees. And I do not think such casual knowledge is sufficient to impose on the consignee the duty of attending to the discharge of the vessel, and being in readiness to receive his goods as soon as they are ready for delivery. . . . It must be remembered that it is not knowledge of the arrival of the vessel and that she is discharging, but notice of the readiness of the master to deliver, which is the operative fact."

In *Kohn* v. *Packard*, 3 La. 224, 229, the question whether notice of the arrival of a vessel published in the newspapers was binding upon the consignees, was clearly and convincingly treated by Porter, J., who said: "If we understand correctly the usage as proved in evidence, it is this: that notice in the newspapers of the time and place of the landing goods from a vessel, is such notice as places the goods at the risk of the consignee. In other words, that constructive notice binds the party as effectually as personal notice would. If this be the custom, then it is one which this court is prepared to say it cannot sanction. Authorities have been read to show that the goods are to be delivered according to the usage of the port to which they are shipped. The principle may be admitted without at all affecting the conclusion to which we have come, for though the custom may regulate the delivery, it cannot dispense with it. Such would be the effect, however, of the usage relied on in numerous instances. We understand that it is of the essence of the contract of affreightment that there be an engagement to deliver the goods to the consignee.

He consequently must be informed of the time and place the delivery is to be made, to enable him to receive them, and if he has not that information, the other party to the contract cannot dissolve it.   Yet the custom relied on assumes that he may ; for if notice in the newspapers is to bind the consignee of the goods, though he never hears of it or sees it, and if such notice confers on the master of the vessel the right to land the goods on the levee, where they are destroyed or stolen, then it follows that the custom dispenses with delivery, or anything equivalent to it.   This we think custom cannot do.   There must be the act of both parties to terminate the contract, or the default of one of them to authorize the other to do so."

In Parsons on Shipping, vol. 1, p. 224, it is laid down as a general proposition that " in all cases the master is required to give notice to the consignee of the arrival of the vessel, and of his readiness to discharge the cargo, and knowledge, therefore, acquired that the vessel has arrived and will discharge her cargo at a particular wharf, is not enough.   Generally if a notice in the newspapers is relied on, it must be shown that the consignee read the notice."   This same rule is approved in Leggett on Bills of Lading, p. 279.

There is not only no finding by the court below that the deposit of the goods on the Inman pier, No. 36, without previous notice to the consignees, was in accordance with any general usage of the port of New York, but, on the contrary, the court found a state of facts which established a *course of dealing* between the parties inconsistent with any such usage.

Thus, by the nineteenth finding, it appears that during the five years preceding the consignment in question the libellants had received six consignments of merchandise in steamships belonging to the respondent, under bills of lading substantially in the same form as the bill of lading herein, all of which were landed and discharged on pier No. 39 ; that during the same period the freight bills for these six consignments were sent to the libellants, each containing a reference to that pier, and that pier only, as the pier of the respondent company where the goods would be found upon their arrival and dis-

charge; that this was true of the consignment to the libellants in this case, the freight bill of which was the same in form as the preceding six, and which was not received by the libellants until February 1, 1883, the day after the goods had been destroyed by fire.

It was further found by the court below:

"(20) That during the said five years preceding the time of the arrival of the steamship Egypt in this case, that being the period during which the libellants had been receiving goods by the respondent's line from time to time as aforesaid, there have been two hundred and forty-one arrivals of the respondent's steamships at said port of New York coming from said port of Liverpool, and in only eight instances does it appear that the said steamships or any of them discharged at any dock other than that known as the National dock, exclusively occupied and controlled by the respondent as aforesaid, and no evidence was offered with reference to the circumstances attending the discharge of said eight vessels. As to forty-one of said steamships, evidence of the place of their discharge was not produced.

"(22) That prior to the arrival and discharge of said steamship Egypt at said Inman dock as aforesaid no steamship belonging to the respondent from said port of Liverpool or elsewhere had ever been discharged at said dock owned and controlled by the Inman Steamship Company, Limited, as aforesaid.

"(23) That said dock known as the National dock, being pier No. 39, North River, in the city of New York, is and was at the time of the arrival of the steamship Egypt as aforesaid the usual and a proper place at said port of New York for the discharge of cargoes coming from said port of Liverpool in steamships belonging to the respondent company, and is and was at such time a proper place at said port of New York for the discharge of the said thirty-six packages of merchandise belonging to the libellants, and destroyed as aforesaid.

"(24) That said dock known as the National dock, being said pier No. 39, North River, in the city of New York, was

the dock and place ordinarily and generally, but not invariably, used at said port of New York for the discharge of cargoes coming from said port of Liverpool in steamships belonging to the respondent company.

"(25) That the National dock, being pier No. 39, North River, in said city of New York, is and was at the time of the discharge of the steamship Egypt as aforesaid, the dock or wharf to which consignees of cargo coming from said port of Liverpool to said port of New York in steamships belonging to the respondent company would naturally and usually go for the purpose of caring for and receiving a delivery of their consignments."

It is also admitted in the amended answer of the respondent that "there is nothing in the bills of lading which led the libellants to believe that the goods in said bills of lading were not to be landed on said National dock, (No. 39,) and there delivered" to the libellants.

It is not set up or claimed in the answer of the respondent that in discharging and depositing the goods, without notice to the consignees, at a different pier from that at which it was in the habit of landing and delivering other consignments to the libellants, the carrier was acting in pursuance of any established custom or usage of the port of New York. No such justification is set up; on the contrary, the answer alleges that the consignees had due and proper notice that the goods would be landed or discharged at pier No. 36. It denied the libellants' allegation that they did not have notice that the goods were not to be landed and delivered at the National dock, No. 39, and averred that the libellants did have notice that the goods carried by the Egypt were to be landed at pier No. 36, at which they were actually landed. The seventeenth finding of fact contradicts this denial and averment of the answer.

The carrier having landed and deposited the goods, not at its usual and customary place of discharge, where the consignees would naturally expect to receive their consignment, as they had always previously done, and there being an implied undertaking on the part of the carriers to discharge

at the usual wharf according to the established course of dealing between the parties, the duty of giving notice that the discharge and delivery of the goods would be made at another and different place became the more imperative upon the carrier.

In Story on Bailments, § 545, it is said: "In America the rule adopted in regard to foreign voyages, although it has been matter of some controversy, seems to be that in such cases the carrier is not bound to make a personal delivery of the goods to the consignee, but it will be sufficient that he lands them at *the usual wharf or proper place of landing,* and gives due and reasonable notice thereof to the consignee. . . . . But it is of the very essence of the rule that due and reasonable notice should be given to the consignee before or at the time of the landing, and that he should have a fair opportunity of providing suitable means to take care of the goods and to carry them away."

So, in Addison on Contracts, § 961 : "If it is customary for the carrier by water to carry merely from port to port, or from wharf to wharf, and for the owner or consignee to fetch the goods from the vessel itself, or from the wharf, as soon as the arrival of the ship has been reported, the carrier must give such owner or consignee notice of the arrival of the goods on board, or at the customary place of destination, in order to discharge himself from further liability as a carrier. He cannot at once discharge himself from further liability by immediately landing the goods without any notice to the consignee, but is bound to keep the goods on board or on the wharf, at his own risk, for a reasonable time, to enable the consignee or his assigns to come and fetch them."

The rule thus laid down is supported by *Salmon Falls Mfg. Co.* v. *Bark Tangier,* 21 Law Rep. 6; *Gibson* v. *Culver,* 17 Wend. 305; 2 Kent, 604; Maclachlan on Merchant Shipping, (4th ed.,) 453, 454; *Hyde* v. *Trent & Mersey Navigation Co.,* 5 T. R. 389; *Gatliffe* v. *Bourne,* 4 Bing. N. C. 314.

In *Gatliffe* v. *Bourne,* to a declaration on a contract by a master of a steam vessel to convey goods from Dublin to London, and to deliver the same at the port of London to the

plaintiff or his assigns, a plea was filed to the effect that after the arrival of the vessel at London defendant caused the goods to be unshipped and safely and securely landed and deposited in and upon a certain wharf, called Fenning's wharf, at the port of London, there to remain until they could be delivered to the plaintiff, said wharf being a place where goods from Dublin were customarily landed and deposited for the use of consignees, and a place fit and proper for such purposes; that while the goods were thus deposited upon said wharf and before a reasonable time for delivery had elapsed, they were destroyed by an accidental fire. This plea was held to be bad, and the carrier was charged with the loss of the goods accidently burned while deposited on the wharf. This decision was affirmed in the Exchequer Chamber, *Bourne* v. *Gatliffe*, 3 Man. & Gr. 643, and in the House of Lords, *Bourne* v. *Gatliffe*, 11 Cl. & Fin. 45; *S. C.* 7 Man. & Gr. 850, and *S. C.* 8 Scott, (N. R.,) 604. In the report of the case before the House of Lords it is stated that no notice was given to the plaintiff that the goods were landed upon the wharf.

This case, in principle, controls the present case, unless the special clauses of the bill of lading authorize the deposit of the goods upon the Inman wharf without notice to the consignees and at their risk. The provisions of the bill of lading already considered do not confer such authority, and if it exists it must be found in the remaining clause, viz.: "The United States Treasury having given permission for goods to remain forty-eight hours on wharf at New York, any goods so *left by consignee* will be at his or their risk of fire, loss, or injury."

This is the only clause in the bill of lading which in any way refers to a deposit of the goods upon the wharf. The court in its opinion construes this language to mean "The United States Treasury having given permission for goods to remain forty-eight hours on wharf at New York, any goods so remaining will be at the consignee's risk of fire, loss, or injury." This construction not only gives no effect to the words "left by the consignee," but substitutes the act of the master for

that of the consignee. It makes the master's act of depositing a leaving by the consignees. The words "left by the consignee" clearly contemplate the voluntary leaving, not by the master, but by the consignee, which could only occur after due notice that the goods were so deposited, and a reasonable opportunity afforded for removing them. The words import a voluntary act of leaving on the part of the consignee, that is to say, the consignee must suffer or permit the goods to remain, or omit to remove them after it has become his or their duty so to do. The consignees' duty of positive and affirmative action is not called into exercise until after they have had notice that their goods will be or have been deposited on the wharf. Until such notice and an opportunity to take charge of the goods is given to the consignees, it is a perversion of language to say that the goods are *left* by them.

Reading this clause in connection with the former, it clearly appears that what the parties meant and provided for was that if the consignees were not ready to receive their goods immediately upon their discharge from the vessel, the master was to deposit them, not on the *dock* or *wharf*, but in the *warehouse* or *public store* at the expense and risk of the consignees; but that if the carrier availed itself of the Treasury regulations to deposit the goods on the wharf under the forty-eight hour clause, the consignees' risk and liability for loss, while so deposited, would not commence until after they had notice of such deposit and a reasonable opportunity to remove the goods. It cannot be properly said that there was or could be, on their part, any leaving of the goods so deposited until the consignees were put upon the duty of accepting delivery, or taking charge of the consignment, which would not arise until they had received notice.

This interpretation of the clause is sustained by the well-considered case of *McKinney* v. *Jewett*, 90 N. Y. 267, 270, 272, where the contract provided that the carrier should not be liable as such, while the goods were "at any of their stations awaiting delivery."

But, conceding that the clause is ambiguous, the settled rules of construction do not sanction a liberal interpretation thereof

in favor of the carrier, but directly the reverse. Especially is this so when, as in the present case, the steamship company has, by its action in procuring the forty-eight hour permit, itself placed a different construction upon the clause. It is well settled that the practical construction placed by parties interested upon doubtful or ambiguous terms in a contract will exercise great and sometimes controlling influence in determining its proper meaning. *Topliff* v. *Topliff*, 122 U. S. 121; *District of Columbia* v. *Gallaher*, 124 U. S. 505.

The general order for discharge, obtained upon the entry of the vessel, directed that the cargo, except certain perishable articles, gunpowder, neat cattle, etc., should be landed and sent to public store 502–510 Washington Street. This general order was not acted on by the steamship company, but as shown by the eleventh finding of fact, after securing the general order the respondent obtained from the collector of the port a special license, under the provisions of section 2871 of the Revised Statutes, to unload at night, and gave bond to indemnify and save the collector harmless from any loss or liability which might occur, or be occasioned by reason of the granting of that special license. The carrier furthermore voluntarily applied to the collector and obtained a permit for the goods to remain upon the wharf for forty-eight hours from the time of granting the general order, at the risk of the owners of the steamer, and upon the agreement that they would pay to the consignees or owners the value of such cargo respectively as might be stolen, burned, or otherwise lost while so deposited.

The permit to unload at night was manifestly for the benefit and convenience of the carrier. The same is true in respect to the permit for the goods to remain on the wharf for forty-eight hours. The unloading commenced in the afternoon of January 31, after business hours, and was continued through the night; and even if notice had been given to the consignees, there was no reasonable time and opportunity afforded them to remove or take charge of the goods before they were destroyed by fire.

In the execution of its undertaking to deliver the goods to

the consignees at the port of New York, the carrier had no right to change or increase the risk by any departure from the express stipulations of the contract. In unloading at night for its own benefit, and in depositing the goods upon the wharf for its own convenience, the risk and liability of loss was manifestly increased; and the goods having been destroyed while subjected, by the voluntary act of the carrier to this increased risk, it is liable for the loss, unless expressly exempted by some provision of the affreightment contract. It must be borne in mind, as Lord Lyndhurst expressed it in *Gat-liffe* v. *Bourne*, before the House of Lords, that the contract was "to deliver the goods to the consignees" at the port of destination. Instead of making, or attempting to make, such delivery, either actually or constructively, the carrier, on a permit from the collector, deposited the goods on the wharf, thereby changing, if not increasing, the risk of loss, in a way not provided for by any stipulation of the contract.

Again, it was found by the Circuit Court (12) "That said general order and special license and said applications and permits and the agreements and engagements therein contained were the usual and customary ones ordinarily made and granted in such cases, and that they were made and granted under and by the authority in and by said bill of lading conferred upon the respondent and upon said collector of the port of New York by the libellants herein, and under and in accordance with the provisions of law in that behalf and the regulations of the United States Treasury Department on that subject." And further, (13) "That said applications were made and said general order and special license and permits were obtained on behalf of the respondent under the instructions and by direction of the respondent's agent in the city of New York, and all of the agreements and engagements made and entered into therein or thereby and on behalf of the respondent or the libellants were made and entered into under and pursuant to the same instructions and directions of said agent."

In the light of these findings the contract of the parties should be interpreted as though the clause in question had

read as follows: "The United States Treasury having given permission for goods to remain forty-eight hours on the wharf at New York, at the sole risk of the steamship company, and upon its undertaking to pay to the consignee or owner the value of such cargo respectively as may be stolen, burned, or otherwise lost while so remaining, now it is understood that if the steamship company avails itself of this regulation, and obtains permission for the consignment to remain on the wharf for forty-eight hours upon said terms, its risk and liability for losses shall only continue and remain in force until the consignee has had due notice and opportunity to remove or take charge of the goods; and if, thereafter, they are left by the consignee, it will be at his risk of fire, loss, or injury." This harmonizes all the clauses, and is alone consistent with the correlative duties and obligations of the parties.

It is not material to the present case to determine whether the regulations of the Treasury Department, set out in the eleventh finding of the court below, have the force of law, and imposed upon the steamship company the duty of entering into the stipulation to pay the consignees for the loss of the goods deposited on the wharf under the forty-eight hour permit. That stipulation was entered into voluntarily by the steamship company. There was no requirement in the contract of affreightment that it should obtain any such permit, and it cannot be properly said that the stipulation which it entered into in order to secure permission for the goods to remain forty-eight hours on the wharf, was inconsistent with any provision of the law or regulations of the Treasury Department. No provision of the bill of lading exempted the carrier from liability for loss by fire that might happen while the goods were deposited on the wharf under the forty-eight hour permit, and no reason appears why the carrier might not expressly undertake a liability which the law would otherwise impose upon it, until by proper notice the duty of taking care of the goods was shifted or transferred to the consignees.

But, it is said, the consignees cannot avail themselves of this promise made by the steamship company to the collector

because they are not privies thereto. This, however, ignores the above findings of fact by the court, which make the consignees parties to the arrangement. Aside from this, while it is undoubtedly the general rule that a person who is not a party to a simple contract, cannot enforce such contract at law, and that a promise made by one person to another for the benefit of a third, who is a stranger to the consideration, will not support an action by the latter, *National Bank* v. *Grand Lodge,* 98 U. S. 123, there are many exceptions to the rule, one of which, according to the New York decisions, is where the party seeking to enforce the contract was intended to be the beneficiary of the promise. *Lawrence* v. *Fox,* 20 N. Y. 268; *Coster* v. *Albany,* 43 N. Y. 399, 410, 412; *Garnsey* v. *Rogers,* 47 N. Y. 233; *Vrooman* v. *Turner,* 69 N. Y. 280.

The promise made by the steamship company in the present case falls directly within the rule announced in *Vrooman* v. *Turner,* 69 N. Y. 280, there being, first, a clear intent by the promisor to secure a benefit to the consignees; second, a privity between the two in respect to the protection of the goods, the risk of which the carrier assumed; and, third, an obligation or duty owing by the steamship company to the consignees to properly care for the goods until delivery could be made, which gave to the consignees a legal and equitable claim to the benefit of the promise. The decisions in other States are conflicting on this question.

But if an action at law would not lie upon the promise made by the respondent in obtaining the forty-eight hour permit, it by no means follows that the consignees could not successfully invoke the aid of a court of equity in enforcing the agreement. The legal rule invoked is not so rigidly or so strictly adhered to by courts of equity as by courts of law. Thus, in *Keller* v. *Ashford,* 133 U. S. 610, 625, the mortgagee was permitted to enforce in equity a contract between the mortgagor and his grantee, by the terms of which the grantee assumed the payment of the mortgaged debt. See also *Willard* v. *Wood,* 135 U. S. 309, 314; *Norwood* v. *De Hart,* 3 Stewart, (30 N. J. Eq.,) 412.

Now the broad principles of equity are recognized and applied by the admiralty courts, and the steamship company's agreement being, as properly held by the court below, an admiralty contract, and the consignees being the parties intended to be benefited thereby, and it being one contemplated by the parties at the time of entering into the contract of affreightment, no valid reason is seen why the consignees should not have, by this libel, the right to enforce the stipulation, voluntarily entered into by the steamship company, which agreement is not in conflict with any provision in the bill of lading.

It is true that the court below found (twenty-seventh finding) that it was the intention of the parties to the bill of lading that goods remaining for forty-eight hours on the wharf, under the permit obtained on the application of the steamship company, should be at the risk of the consignee of fire, notwithstanding the agreement of the steamship company to assume such risk. This is not a good finding of fact, but is a mere conclusion of law based upon the court's construction of the clauses of the contract, above referred to, and is not binding upon this court.

The opinion of this court seems to proceed largely upon the idea that the consignees, if they had received notice, could not have removed the goods before they were destroyed; and, further, that inasmuch as they took no steps on the faith of the cargo being discharged at the usual place, they were not prejudiced by the change. These are considerations that do not control or change the rights and liabilities of the parties. The real question in cases like this is, whether the carrier has brought itself within any exemption from liability by showing that the loss was caused by the act of God, or by the public enemy, or by the shipper, or was within some excepted clause in the contract of affreightment. If this is not shown, the carrier is liable for the loss. *Clark* v. *Barnwell*, 12 How. 272, 280.

While not controverting the legal principles governing the liabilities and duties of carriers, the opinion of the court seems to imply that to some extent they should be modified

or suspended to meet the improved modern methods of rapid transportation. But I submit that long established legal principles, founded upon a wise public policy, are not to be either ignored or disregarded to meet a supposed public convenience, especially in a case like the present, where the resident managing agent of the carrier knew for at least six days before the arrival of the vessel that she would land and discharge her cargo, not at the usual place, but at the Inman pier, and thus had ample opportunity to give to the consignees, who were known to the steamship company, notice of the change. The true rule on this question is well stated by Judge Porter in *Kohn* v. *Packard*, 3 La. 230, as follows: "There are inconveniences in whichever way the question is viewed. On the part of the owners of the ship, that of giving such notice of the time and place of discharge, as will enable them to bring knowledge of the fact home to the persons who are to receive the goods, or in default thereof, imposing on the former the obligation of sending the merchandise to some place of safety. But this inconvenience we think is not to be compared with that to which the latter would be subject if their property could be landed without their knowledge and be thereby lost or damaged. On the one side there is additional trouble; on the other, probably, a total loss. After the best consideration in our power, we think the conclusion we have come to is most consonant to law and will tend to promote public convenience."

The opinion of the court does not deal with that clause in the bill of lading which provides that the steamship company, or its "agents, or any of its servants, are not to be liable for any damage to any goods which is capable of being covered by insurance." The court below held that this clause relieved the steamship company from liability. This condition or provision of the bill of lading is expressed in terms so general and comprehensive as to require the shipper or consignee to insure, not only against the enumerated perils and exceptions, but against any and all malfeasance or misfeasance on the part of the carrier. It admits of grave doubt whether this provision is not so unreasonable as to be void under the principle

laid down by this court in *Railroad Co.* v. *Lockwood,* 17 Wall. 357, 380, 382; *Hart* v. *Pennsylvania Railroad,* 112 U. S. 331; *Phœnix Ins. Co.* v. *Erie Transportation Co.,* 117 U. S. 312, 322, 323; *Inman* v. *South Carolina Railway,* 129 U. S. 128, 139; *Liverpool Steam Co.* v. *Phenix Ins. Co.,* 129 U. S. 397, 455; Carver on Carriers, (2d. ed.,) § 110; *Peek* v. *North Staffordshire Railway,* 10 H. L. Cas. 473. In this last case the condition was that the company " shall not be responsible for loss of or injury to any marble . . . unless declared and insured according to its value," and it was held, upon full consideration, that the condition, as a whole, was unreasonable and void.

In the present case it is not necessary to determine that this clause is so unreasonable as to be void. So far as it has been considered by the courts, it has been restricted in its application. Thus, in *Taylor* v. *Liv. & Gt. Western Steam Co.,* L. R. 9 Q. B. 546, it was held not to cover a loss of the goods by theft, committed while they were on board, either during the voyage, or after arrival; and in *The Titania,* 19 Fed. Rep. 101, while the provision was considered valid, it was held by the court that it must be construed to refer to insurance which might be obtained in the usual course of business from the ordinary insurance companies, either in the usual form, or in the customary course of business upon special application. In that case injury from the breaking loose of a spare propeller was held not to be within the exemption.

Giving to the clause this reasonable construction, the loss in question would not have been covered by the ordinary marine policy on the cargo, which generally covers the goods while being carried aboard ship, during the voyage, and *until safely landed, and no longer.* The clause did not impose upon the consignees the duty of anticipating that the carrier would land the goods at an unusual place, and it would have been out of the usual course of business for the consignees to have sought to insure against what they did not, and could not, know would take place.

So, in reference to fire insurance. While it was shown by one of the witnesses that fire insurance could have been

procured on "goods lying on the wharf by the side of the ship, before they were actually taken away," the clause in question did not require that the consignees should have anticipated that their goods would be unloaded at night and deposited on the wharf. Aside from this, it is ordinarily essential in a fire insurance policy that the locality of the risk should be specified. The consignees in the present case could not have complied with this general rule without having some knowledge or information as to where their goods would be landed. The local agent of the steamship company had six days' notice of the fact that the cargo of the vessel would be landed at the Inman pier, No. 36, but that fact was not communicated to the consignees, and they had not, therefore, the data to procure ordinary fire insurance upon the goods after being landed.

It would be unreasonable, and contrary to sound principle, to allow the carrier to assert exemption under such an insurance clause without affording the consignees, by proper notice, an opportunity to effect insurance in the usual way upon their goods while deposited on the wharf. If, after being notified that their goods were deposited on a particular wharf, other than that at which their consignments were usually received, the consignees had failed and neglected to take out insurance, the clause, if valid, might have been invoked for the protection of the carrier. But under the facts of this case, to give the carrier the benefit of the clause would be to allow it to take advantage of its own neglect of a legal requirement.

I am of opinion that the decree appealed from should be reversed, and the court below directed to enter a decree in favor of the libellants; and I am authorized to state that MR. JUSTICE FIELD and MR. JUSTICE GRAY concur in this opinion.