CAMDEN WOOLEN CO. v. EASTERN S. S. LINES, Inc.

(District Court, D. Maine, S. D. October 10, 1925.)

No. 1010.

1. **Shipping** ☞132(5)—**Evidence held to establish that goods had arrived at carrier's dock more than 72 hours before destruction by fire.**

Relative to liability as warehouseman, evidence *held* to show that goods had been received at defendant carrier's dock more than 72 hours prior to their destruction by fire.

2. **Shipping** ☞126—**Notice to consignee of arrival of goods held to have been given more than 72 hours prior to destruction by fire.**

Notice of arrival of goods at carrier's dock *held* to have been given to consignee more than 72 hours before destruction by fire.

3. **Shipping** ☞132(5)—**Evidence of custom between carrier and consignee held admissible on question of interpretation of contract as related to notice of arrival of goods.**

Where bill of lading provided that carrier would only be liable as warehouseman for goods left in its possession more than 72 hours after notice to consignee of arrival, evidence of custom between carrier and consignee, pursuant to which consignee's truckman made daily inquiries concerning arrival of goods for consignee, *held* admissible as bearing on interpretation to be given contract and notice required by it.

**4. Customs and usages ☞17—Evidence of custom or usage repugnant to express terms of contract cannot be considered.**

Evidence of custom or usage repugnant to express terms of contract cannot be considered.

**5. Shipping ☞141(1)—In federal courts, conditions of liability where goods are left with carrier after arrival stipulated in bill of lading are controlling.**

In federal courts, conditions of liability where goods are left with carrier after arrival, stipulated in bill of lading, are controlling.

At Law. Action by the Camden Woolen Company against the Eastern Steamship Lines, Inc. Judgment for defendant.

Z. M. Dwinal, of Camden, Me., for plaintiff.

Thompson, Hoague & Hill, of Portland, Me. (N. W. Thompson, of Portland, Me., of counsel), for defendant.

HALE, District Judge. This is an action at law to recover for the loss of certain shipments of goods, made by the plaintiff over the lines of the defendant company, by a fire on its terminal at Camden, Me. The plaintiff is a corporation, manufacturing woolen goods at Camden, Me. The defendant is a common carrier by water, operating a fleet of passenger and freight steamers between the ports of New York and Boston, Portland, Rockland, Camden, Bangor and other ports, at all which ports it owns or controls terminal facilities.

On the morning of August 2, 1924, its terminal at Camden, Me., caught fire and was destroyed, together with the property upon it. As a part of the property destroyed were 17 bales of wool, 3 barrels of oakite, and five barrels of soap; the above articles being consigned to the plaintiff, and shipped from Philadelphia, by way of the Merchants' & Miners' Line, to Boston, where they were received by the defendant corporation at its terminal and forwarded by it from Boston to Camden.

The plaintiff claims that the defendant, as a common carrier, is liable for this loss.

The defendant says that the goods in question were shipped under a uniform bill of lading, and arrived on the dock at Camden more than 72 hours prior to 2 o'clock a. m., August 2d, the time of the fire; that the property was not removed by the plaintiff within the free time allowed by tariffs lawfully on file, namely, within 72 hours after notice of the arrival of the property at destination had been "duly sent or given" to the plaintiff; that its responsibility as a common carrier had ceased; that its only responsibility was that of a warehouseman; and that it had fully discharged such responsibility, and is not liable.

The bill of lading, the contract in the case, provides, among other things, as follows:

"Sec. 4. (a) Property not removed by the party entitled to receive it within the free time allowed by tariffs lawfully on file (such free time to be computed as therein provided), after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property for delivery at destination has been made, may be kept in vessel, car depot, warehouse or place of delivery of the carrier, subject to the tariff charge for storage and to carrier's responsibility as warehouseman, only, or, at the option of the carrier, may be removed to and stored in a public or licensed warehouse at the place of delivery or other available place, at the cost of the owner, and there held without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage."

It is admitted on all sides that the free time allowed by the bill of lading was 72 hours.

[1] I. The first question of fact in the case is whether or not the goods in question arrived on the defendant's dock at Camden more than 72 hours prior to August 2, 1924.

The testimony clearly shows that a shipment of 20 bales of wool was made from Philadelphia, by way of the Merchants' & Miners' Lines, on June 27, 1924, and that on the steamer's arrival in Boston the bales were receipted for by the defendant; that a few days later a shipment of 29 bales of wool was made over the same route; and that this later shipment arrived in Boston in due course, and was there receipted for by the defendant. The testimony makes it clear that out of the 20-bale lot 2 bales, and out of the 29-bale lot 15 bales, were destroyed by fire on August 2d at Camden. The wharf superintendent on the Boston wharf testifies that these shipments of wool went forward from Boston to Camden within a day or two after their arrival in Boston, and Brown, the superintendent of the dock at Camden, referring to his books, testifies that all the shipments in question had arrived at the defendant's terminal in due time after their shipment from Boston, and that freight bills covering these shipments were

sent by the defendant and received by the plaintiff on or about July 15th. Brown testifies that he never sent out a freight bill, either prepaid or collect, until he checked the goods on the wharf at Camden.

McGrath, the assistant on the wharf at Camden, testifies that the goods in question were there long before the fire. He says that Currier, the plaintiff's truckman, helped him wheel the wool around to the back of the shed near the warm room, because the plaintiff "couldn't take it on account of being crowded."

Brown testifies that he is sure the truckman had knowledge of the fact that the goods had come before the bills were sent out. The truckman, Currier, says he does not remember that he helped put away the 17 bales upon the wharf, and testifies that, if he said the goods were not taken away because the mill was too crowded, he must have said it "in a fooling way."

The superintendent of the plaintiff admits that the freight bills for these goods were received long before the fire, but says that freight bills are sometimes paid before receiving the freight.

With reference to the small shipments of oakite and soap, testimony is not materially different from that relating to the wool. By a clear preponderance of evidence I find as a fact that all the goods in question, except the oakite, arrived on the defendant's dock at Camden previous to July 15, and much more than 72 hours prior to August 2, 1924, and that the oakite arrived about a week after the wool.

[2] II. Was notice of the arrival of the goods in question "duly sent or given" to the plaintiff at least 72 hours before August 2, 1924?

The testimony shows that for about 35 years the defendant and its predecessors have been transporting freight for the plaintiff at Camden; that during a great part of this time a truckman, Currier, has been trucking goods belonging to the plaintiff and found on the defendant's terminal in Camden; that for the past 2 years he has been trucking exclusively for the plaintiff and for the Penobscot Woolen Mill, which is under the same management; that during all this time no written notice of the arrival of goods on defendant's terminal at Camden has been given to the plaintiff. Matthews, the plaintiff's office manager, testifies that during the 5 years he has been with the plaintiff company no written notice has ever been received by it, but that the custom was to send the truckman down, or call up the agent of the steamship company, to see if wool had come. Those familiar with the conduct of business on the wharf testify that every morning the truckman for the Camden Woolen Company came to the wharf, or called up and found out what there was there for the Woolen Company, and sometimes checked over the bills to see what was there.

The truckman himself testifies that "some time during the day, every day, he finds out what there is down there." Brown, the defendant's agent on the wharf, says, in respect to all the goods in question in this case, that he had notified Currier of their arrival, and that in accordance with his long-established practice he sent the freight bill covering the shipment of the 20 bales of wool on July 5th, and of the other 29 bales on July 15th, long before the 72 hours previous to the fire, and that he is certain that the truckman had knowledge that the goods had come, before the freight bills were sent to the consignee.

Matthews, consignee's agent, admits that the freight bills were received by the woolen company, but says that sometimes he has to pay freight bills, whether the goods are on the wharf or not. He does not, however, explicitly deny that he had knowledge that the goods had arrived on the wharf, and there is no evidence that the freight bills in question were in fact paid before the reception of the goods on the wharf.

I see no reason for doubting the truthfulness of Agent Brown when he says that he never sends out a freight bill until the goods have been delivered or are on the wharf, and that he did send the freight bills for the wool to the plaintiff on or before July 15th. I find as a fact that he did so send them, and I see no reason why the sending of the freight bills, after the reception of the goods on the wharf, may not be held to be, in itself, a substantial compliance with the terms of the bill of lading requiring that notice to the plaintiff of the arrival of the goods be "duly sent or given."

It appears in evidence that during July only 2, 3, or 4 bales each day were taken from the wharf by the woolen company and used in the manufacture of goods; and it clearly appears in testimony—and I find as a fact—that the 17 bales of wool, as well as the soap and oakite, were on the wharf at the time of the fire. The learned counsel for the plaintiff says that their burned remains were found there after the fire, and he has presented his case with great care and most painstaking attention to details.

By a clear preponderance of the evidence I am constrained to find that the plaintiff company had knowledge more than 72 hours previous to the fire that all the goods in question were upon the terminal in Camden, and that for its own convenience, in the course of manufacture, it had not taken possession of the goods. I find, further, that notice of the arrival of the goods in question was "duly sent or given" to the plaintiff under the terms of the bill of lading at least 72 hours before August 2, 1924, and that the defendant was acting as warehouseman for these goods at the time of the fire.

[3] The testimony of the usage of the parties is received in evidence, not to contradict the contract, but to aid in its interpretation, and as tending to show that the parties made the contract having in mind their custom, of many years' standing, in reference to notice of the arrival of goods on the terminal.

[4] It is clear that no evidence of custom or usage can be considered which is repugnant to the express terms of a contract. Randall v. Smith, 63 Me. 105–107, 18 Am. Rep. 200. "Instruments are to be interpreted according to the recognized practice and usage with reference to which the parties are supposed to have acted, and the sense of the words so interpreted may be taken to be the appropriate and true sense intended by the parties." Best on Evidence, vol. 1, § 228, citing and quoting Broom's Maxims. While parol evidence is not to be received to contradict or vary a written contract, it may and must be received to show known and established usage respecting the subject to which the contract relates. Greenleaf on Evidence (16th Ed.) vol. 1, §§ 280, 292. In Eaton v. Smith, 20 Pick. 150, 156, 157, Mr. Chief Justice Shaw, in speaking for the Massachusetts court, said: "When a word is used * * * as applicable to any trade or branch of business, * * * it is proper to receive evidence of usage, to explain and illustrate it. * * * In construing a written instrument, every part of it is to be considered with a view to ascertain the object and scope of it, and thus get at the intent of the parties, which is the governing rule of construction." Murray v. Hatch, 6 Mass. 465, 473, citing and quoting Lord Mansfield in Mason v. Skurray, in which case the decision turned upon the proof of "established usage and practice."

[5] In the federal courts it is settled law that the conditions of liability are controlling, as stipulated in the bill of lading, where goods are detained after arrival. Southern

Ry. Co. v. Prescott, 240 U. S. 632, 638, 36 S. Ct. 469, 60 L. Ed. 836; Peavey v. Pa. B. & W. R. Co., 51 App. D. C. 127, 277 F. 333, 334. In the latter case the Court of Appeals for the District of Columbia had before it a bill of lading providing that the notice of arrival of goods at destination may be "duly sent or given."

In Constable v. Nat. S. S. Co., 154 U. S. 51, 62, 14 S. Ct. 1062, 1066 (38 L. Ed. 903), in speaking for the Supreme Court, Mr. Justice Brown said: "In lieu of a personal notice to each consignee, * * * a custom has grown up in the port of New York of posting on a bulletin board in the custom house a notice of the time and place of discharge. Taking all these facts into consideration, we see no impropriety in the company limiting itself to the liability of a warehouseman with respect to the goods so discharged into its own warehouse."

In the case at bar, the "scope and intent" of the contract is clearly to give a consignee ample knowledge of the arrival of goods at the point of destination. To effect this end notice must be "duly sent or given"; after such notice the consignee must have 72 hours to get its property. The facts disclosed in the record clearly justify the findings which I have made that the bales of wool in question were upon the terminal in Camden on or before July 15th, and long before 72 hours preceding August 2d; that the bales were sent from Boston in the two lots, one of 20 and one of 29 bales, and not in the small quantities of 2 or 3 bales a day, as urged by the plaintiff; and it is undisputed that the 17 bales were found in their burnt condition upon the wharf after the fire.

The record discloses, further, that the shipment of soap was received on the defendant's terminal at Camden prior to July 15th, and that the freight bills for same were sent to the plaintiff on July 15th; that the oakite in question arrived on the terminal at Camden prior to July 21st, and that the freight bill was sent to the plaintiff on July 21st.

The record discloses that the plaintiff obtained its knowledge of the arrival of all the goods in question the same way it had obtained such knowledge for years before, and in the same way it had approved by its conduct of years. Such knowledge or notice was thus obtained in a "regular and approved manner," at least 72 hours before August 2, 1924.

I have already found that, with respect to the goods in question, the defendant was a warehouseman, and I must conclude, from

the evidence, that the plaintiff has failed to show that the defendant is liable as a carrier for the loss declared on in the writ.

The result is that there must be judgment for the defendant.