O. M. Earle Co. Inc., Plaintiff, *v.* The Munson Steamship Lines, Defendant.

City Court of New York, August 27, 1929.

*Slayton & Jackson* [*G. Noyes Slayton* of counsel], for the plaintiff.

*Rumsey & Morgan* [*John Tilney Carpenter* and *William K. Allison* of counsel], for the defendant.

NOONAN, J. The plaintiff was the consignee of a shipment of 713 crates of tomatoes which were carried by the steamship *Munargo* of the defendant company from Southwest Bay, near Nassau, Bahama Islands, to the port of New York. The shippers of these tomatoes also assigned to the plaintiff their claims for damages arising from the alleged negligence of the defendant with respect to the carriage. The *Munargo* with the tomatoes and other cargo aboard arrived at the port of New York at ten A. M., Sunday, December 27, 1925, and docked at her regular berth on the south side of pier 9, East river. Her bow was headed inshore, and her starboard side was alongside of the pier. The schedule of the *Munargo* called for a round voyage between Nassau and the port of New York in the course of a week. She was late in arriving, as she was due, according to schedule, on the previous Thursday. The

defendant, therefore, was desirous that she pick up her schedule, and upon her arrival an immediate discharge of her cargo was ordered. This unloading began at eleven A. M., and was finished at six-forty P. M. the same day. The *Munargo* then steamed away for Nassau at six-fifty-six P. M., her stay in the port of New York having been less than a day. The cargo consisted principally of tomatoes, and the crates consigned to the plaintiff were stowed in the 'tween-decks of the vessel, which were on a level with the floor of pier 9. When she commenced to discharge her cargo, the side ports on the 'tween-decks, one forward and one aft of the vessel, were opened, and longshoremen carried the crates on their shoulders, one crate at a time, across the pier and into four lighters chartered by the defendant for that purpose which were tied to the opposite, or north, side of the pier. It took between twenty-five and thirty seconds for each longshoreman to carry a crate of tomatoes out of the side port of the *Munargo* across the pier and into the lighters. The defendant made no charge for this stowage on the lighters.

On Sunday, during the hours of the unloading, the temperature was below freezing all day. The highest temperature was fourteen degrees above zero (Fahrenheit) and the lowest eight degrees above zero (Fahrenheit). The tomatoes were placed in tiers in the center of the floor of the lighters, and between the piled up crates and the sides of each lighter, a distance of about three feet, a ring of kerosene oil stoves, varying in number from eighteen to twenty-four, were placed.

Although two consignees had taken their shipments that Sunday, the plaintiff did not send its truckman for its merchandise until the following Monday morning, December twenty-eighth. When the plaintiff's truckman came on Monday at seven A. M., he examined eighteen to twenty crates of the plaintiff's consignment on board one of the lighters and found some of the tomatoes to be chilled and mostly all of them frozen. The plaintiff's secretary and treasurer, one Newman, was then notified by the truckman, and on his arrival at the pier, at nine A. M., he also made an examination of ten crates of the tomatoes on board the lighter and confirmed the finding of the truckman. On Monday the plaintiff's truckman carted away to the plaintiff's place of business four hundred and thirty-five crates of tomatoes. The balance of the shipment, consisting of two hundred and seventy-eight crates, was taken away on Tuesday.

On Monday the temperature was higher than on Sunday but remained below the freezing point all day, with the exception that at two o'clock in the afternoon it was thirty-four degrees (Fahren-

heit). It ranged between twelve degrees above zero and thirty-four degrees above zero. On Tuesday morning the temperature continued below freezing.

Newman testified that he knew of the delayed schedule of the *Munargo* because he had been in touch by telephone with a Mr. Bresee, who was port manager of the defendant company, and had been informed that the vessel was due from day to day, commencing with Friday until the day of her arrival. He also stated that Bresee told him on Friday afternoon or Saturday morning that nothing would be done with respect to the shipment to jeopardize the plaintiff's interests. This conversation was denied by Bresee. The plaintiff sold the tomatoes at less than their market value and brought this action to recover the difference between that value and the prices realized on the sales. The jury awarded the plaintiff a verdict in the sum of $1,185. It is agreed between the parties that the damage to the tomatoes did not occur previous to the time of the discharge of the cargo.

The plaintiff's consignment was shipped under two bills of lading, each containing the same provisions. The bills of lading contain quite a few exceptions. In view of these exceptions it was necessary for the plaintiff to establish affirmatively that the damage to the merchandise was caused by the defendant's negligence. (*Austin Nichols & Co., Inc.,* v. *Compania Trasatlantica,* 218 App. Div. 660; affd., 245 N. Y. 624; *The Hindoustan,* [C. C. A.] 67 Fed. 794.) From the facts in this case, I do not think it was necessary that the plaintiff, as consignee, should receive express notice of the arrival of the steamer. Nor does this point seem to be insisted upon. It appears from the evidence that plaintiff's representative had knowledge of the delay in the *Munargo's* schedule. He had been in telephone communication with the defendant's office on the previous Thursday and had received word that the steamer was due to arrive some day towards the end of the week.

In clause 2 of the bills of lading it is provided that the steamship company shall not be liable either as carrier or as bailee for any loss or damage arising, among other things, from effects of climate, such as frost. It is true that the steamer discharged her cargo at a time when the weather was intensely cold. The bills of lading, however, gave her that right, because it is provided, in clause 13, that she might commence the discharge of her cargo immediately upon arrival at the port. It is also stated in the same clause that the consignee was required to take the goods " from the ship's tackle, where the ship's responsibility shall cease, and to be taken from alongside by the consignee immediately the vessel is ready to discharge, the agent or master of the ship to have the option

of hiring lighter or craft at the port of discharge for the landing of the goods at the expense and risk of the shippers, owners and consignees, all or any of them." In this case the cargo was discharged onto lighters, without any expense to the consignee. This privilege of immediate discharge is one well recognized under modern shipping conditions. (*Constable* v. *National Steamship Co.*, 154 U. S. 51; 14 S. Ct. 1062; 38 L. Ed. 903.) It would seem from these provisions of the bills of lading that the consignee was under the obligation of watching for the arrival of the ship. Of course, it could receive the required information as to the possible time of arrival from inquiry at the steamship office, and from other well-recognized sources of information. Although the provision of the bills of lading contained in clause 13 would seem to provide that the consignee was obligated to take its merchandise from the ship's tackle immediately upon the discharge of the cargo, still it must be kept in mind that the day of the ship's arrival was Sunday. Apparently, the steamship company did not demand a strict compliance with this provision of the bills of lading, because, instead of discharging the cargo onto the dock, it caused it to be taken into lighters provided for that purpose. In other words, recognizing the circumstances, the defendant company took it upon itself to place the cargo into lighters. Clause 13 of the bills of lading, in this connection, reads as follows: " And if the goods be not taken from the ship by the consignee directly they come to hand in discharging the ship, all responsibility of ship or carrier therefor shall be thereupon ended, and the agent or master of the ship to have liberty at the sole risk, charge and expense of shippers, owners and consignees, all or any of them, to enter and land the goods, put them in hulk, craft or store, deposit them in or upon wharf, warehouse, public stores or Custom House, or permit them to lie where landed as the authorities of the port shall direct, whereupon the goods shall be deemed to be delivered."

In discharging the cargo in the manner adopted, the steamship company was without doubt under the duty of exercising due care. Having exercised the right of taking the goods from the ship and storing them in lighters, it was incumbent upon the defendant to see to it that no damage happened to the goods from its own action. Clause 14 of the bills of lading provides: " Also, that merchandise on wharf, lighters or craft awaiting shipment, transshipment or delivery, be at shipper's risk of loss, damage or delay not happening through the fault or negligence of the owner, master, agent, or manager, of the ship, any custom of the port to the contrary notwithstanding."

The question here is whether the frozen and chilled condition of the tomatoes was caused by any negligent act of the defendant. It must be noted that the temperature on the day of discharge was considerably below freezing, the highest temperature being fourteen degrees (Fahrenheit) above zero, and that the shippers knew or should have known that a winter climate, with a possibility of low temperatures, would prevail in the port of New York when the ship arrived. If the company exercised due care it was not responsible for the effect of climate. The tomatoes became frozen, if at all, either at the time they were taken out of the side ports of the steamship and carried across the dock into the lighters, or at the time they were stowed in the lighters, awaiting the arrival of the consignee. The unloading finished at six-forty P. M. on the day of the discharge, and the plaintiff's truckman did not come to the dock to take away the goods until seven o'clock the following morning. There is evidence to show the care that the defendant used in carrying the goods from the ship into the lighters. It is true that the side port doors were opened and the doors of the lighter were opened at the time that the goods were taken from the steamer, but this being necessary cannot in itself, in my opinion, be held to be negligence. The carriage of the tomatoes across the dock by the longshoremen occupied about twenty-five or thirty seconds. There is nothing to show that this was not an expeditious and careful manner of discharge. There is also evidence that the lighters were heated by kerosene oil stoves, and the chart of the temperatures maintained in the lighters establishes that it was considerably above freezing point. There is evidence in the case to show that tomatoes will become frozen at about twenty-five degrees (Fahrenheit), and that they will become chilled at about thirty degrees (Fahrenheit). The chart of the temperatures in the lighters during the time of unloading shows that the temperatures for a great part of the time were above that number of degrees. On Monday and Tuesday, as the chart shows, the temperatures in the lighters were considerably above the freezing point. The company maintained watchmen in the lighters. It also employed roundsmen, whose duty it was, on a watch of eight hours, to visit each lighter in turn and to take hourly readings of the temperature. There were two thermometers in each lighter, which were hung on posts fore and aft in the lighter, about fifteen feet from the bow and stern, respectively.

After a careful review of the evidence, I have reached the conclusion that the claim of negligence has not been sustained, and that the verdict of the jury in favor of the plaintiff should be set aside. It seems to me that the defendant company did all that

it was required to do under the circumstances, in view of the low temperatures prevailing at the time the vessel discharged its cargo. The case of *Austin Nichols & Co., Inc.*, v. *Compania Trasatlantica* (*supra*) construed a bill of lading containing substantially the same provisions as are embraced in the bills of lading in this case. In the case referred to, the plaintiff sued for leakage of oil contained in puncheons. It was argued that the steamship company was at fault because of the fact that the puncheons had been placed on lighters and that the leakage was caused by heat. Referring to this, the court said " The injury that happened to the oil, if it was caused by permitting the oil to remain on lighters for several days through heat, was an injury that happened to the cargo, the risk of which the shipper had agreed in advance to assume. The plaintiff under this bill of lading was obliged to watch for the arrival of the ship, to be ready to take its goods immediately upon the ship's discharging them. Under clause 11, relating to delivery upon the unloading of the goods, the parties agreed that delivery should be made onto lighters instead of onto the wharf. Since the puncheons were placed on the lighters, plaintiff was under the duty to take them away, and could not impose liability upon defendant by leaving them. After the goods left the deck of the steamer they were, under the bill of lading, at the risk of plaintiff, and the loss of the oil through leakage, because of exposure to the summer heat was the fault of the plaintiff, which had the duty to promptly remove the casks under the terms of the bill of lading."

At the conclusion of the plaintiff's case a motion was made to dismiss the complaint, upon which decision was reserved. The motion to dismiss was renewed at the end of the trial, and decision was likewise reserved. The case was then sent to the jury, which found a verdict in favor of the plaintiff. A motion was made to set aside the verdict of the jury, decision also being reserved upon this motion.

For the reasons stated, the motion to set aside the verdict of the jury is granted, with an exception to the plaintiff, and the motion to dismiss the complaint is granted, with a like exception. Thirty days' stay of execution, and sixty days to make a case. Submit order.